In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1927

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARIO NUNEZ,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 740-1—**Amy J. St. Eve**, *Judge*.

ARGUED JANUARY 25, 2012—DECIDED MARCH 9, 2012

Before BAUER, POSNER, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. This criminal appeal requires us to wrestle once again with the distinction between a "mere" buyer-seller relation and a conspiracy involving a buyer and a seller. For our earlier struggles with the issue, see, e.g., *United States v. Colon*, 549 F.3d 565 (7th Cir. 2008), and the six opinions in *United States v. Lechuga*, 994 F.2d 346 (7th Cir. 1993) (en banc).

The defendant was convicted by a jury of conspiracy to possess and distribute cocaine, in violation of 21 U.S.C.

§§ 841(a)(1), 846, and of related offenses, and was sentenced to 85 months in prison. He asks us to order that he be acquitted of the conspiracy charge (and related charges dependent on it), on the ground that no reasonable jury could find him guilty of conspiracy. He asks in the alternative that we order a new trial on the ground that the verdict of conspiracy was against the weight of the evidence.

Since the sale of illegal drugs is a crime, one might think it would make no difference whether a defendant was prosecuted as a seller or as a member of a conspiracy to sell, and hence that the government would be assuming a gratuitous burden, in charging conspiracy, of proving that the defendant was conspiring, and not just selling. The concern—remote from the traditional criticisms of the concept of conspiracy, see, e.g., *Krulewitch v. United States*, 336 U.S. 440, 445-58 (1949) (Jackson, J., concurring); *Harrison v. United States*, 7 F.2d 259, 263 (2d Cir. 1925) (L. Hand, J.)—is redundancy. *United States v. Reynolds*, 919 F.2d 435, 439 (7th Cir. 1990). But there are legitimate, significant advantages to prosecutors in drug cases not only of proving conspiracy, which is not the same thing as charging conspiracy, but also of obtaining a verdict of conspiracy.

Although the sentence for selling or conspiring to sell is the same when it is based on the same quantity of drugs, 21 U.S.C. § 846, a conspiracy will often, as in this case, embrace a greater quantity than the amount sold by a single defendant; for it will include the amount foreseeable to the defendant that the conspirators

intended to sell in furtherance of the conspiracy. True, for conspiracy as for distribution the relevant quantity for purposes of sentencing under the federal sentencing guidelines is limited to the defendant's "jointly undertaken activity," U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Lewis*, 110 F.3d 417, 422-23 (7th Cir. 1999); *United States v. Spotted Elk*, 548 F.3d 641, 673-74 (8th Cir. 2008); *United States v. Laboy*, 351 F.3d 578, 582 (1st Cir. 2003), a term that while similar to "conspiracy" and often treated as interchangeable with it, see *United States v. Alvarado-Tizoc*, 656 F.3d 740, 744 (7th Cir. 2011), is narrower because the activity undertaken by the defendant in concert with others is more limited than the activity, foreseeable to him, of the entire conspiracy. See *United States v. Morales*, 655 F.3d 608, 635-36 (7th Cir. 2011); *United States v. Almanza*, 225 F.3d 845, 846 (7th Cir. 2000). But proof of conspiracy goes far to establish that the defendant's jointly undertaken activity involved a larger quantity of drugs than those he himself sold.

For purposes of determining statutory (as distinct from guidelines) minimums, moreover, the total amount of drugs attributable to a conspiracy can be aggregated, *United States v. Easter*, 553 F.3d 519, 523 (7th Cir. 2009), but not the amounts involved in multiple counts of distribution. *United States v. Resinos*, 631 F.3d 886, 888 (8th Cir. 2011) (en banc) (per curiam); *United States v. Sandlin*, 313 F.3d 354, 355-56 (6th Cir. 2002) (per curiam); *United States v. Harrison*, 241 F.3d 289, 291-92 (2d Cir. 2001). Statutory minimum sentences, as in 21 U.S.C. §§ 841(b)(1)(A), (b)(1)(B), are a boon to prosecutors because so many sentences are below the guidelines ranges (in fiscal year

2010, 43 percent of sentences nationwide and 49 percent in the Seventh Circuit, U.S. Sentencing Commission, "National Comparison of Sentence Imposed and Position Relative to the Guideline Range: Fiscal Year 2010,", www.ussc.gov/Data_and_Statistics/Annual_Reports_and_ Sourcebooks/2010/TableN.pdf, and "Comparison of Sentence Imposed and Position Relative to the Guideline Range by Circuit: Fiscal Year 2010," www.ussc.gov/ Data_and_Statistics/Annual_Reports_and_Sourcebooks/ 2010/TableN-7.pdf (both visited Feb. 23, 2012)).

Evidence of prior crimes is less likely to be barred from admission by Fed. R. Evid. 404(b)(1) in a conspiracy case, because prior crimes are likely to be germane to establishing that the defendant had a relationship with other participants in his drug deals that went beyond mere buying or selling. See *United States v. Gilmer*, 534 F.3d 696, 705 (7th Cir. 2008); *United States v. Penson*, 896 F.2d 1087, 1092-93 (7th Cir. 1990); *United States v. Mercado*, 573 F.3d 138, 144 (2d Cir. 2009).

Out-of-court statements by a conspirator are freely admissible in evidence against his coconspirators as admissions of a party opponent, rather than being inadmissible as hearsay, Fed. R. Evid. 801(d)(2)(E); *United States v. Rea*, 621 F.3d 595, 604 (7th Cir. 2010); *United States v. Lopez*, 649 F.3d 1222, 1238 (11th Cir. 2011); *United States v. Diaz*, 597 F.3d 56, 67 (1st Cir. 2010), although their admissibility requires not that conspiracy be charged but only that it be proved by a preponderance of the evidence. *United States v. Bolivar*, 532 F.3d 599, 604 (7th Cir. 2008); *United States v. Martinez de Ortiz*, 907 F.2d 629, 632 (7th Cir. 1990) (en banc).

The evidentiary burden on the government of proving a conspiracy often is lighter than that of proving multiple charges of distribution in order to maximize the quantity of drugs for which the defendant can be held responsible. Prosecuting every sale between seller and buyer in this case, for example, would have been difficult. The government had video evidence of only two sales. Proving the others beyond a reasonable doubt would have depended on the credibility of the seller, who had been induced to testify for the government and would be vulnerable to cross-examination. To persuade a jury to convict on a single conspiracy charge the government need prove only an agreement. Quantity is not an element, *United States v. Garcia*, 580 F.3d 528, 535 (7th Cir. 2009); *Barker v. United States*, 7 F.3d 629, 634 (7th Cir. 1993), and proof of an overt act is not required. *United States v. Shabani*, 513 U.S. 10 (1994).

Charging a conspiracy can avoid a statute of limitations defense that would be effective against a charge of distribution. The statute of limitations for conspiracy does not begin to run against an individual conspirator until he withdraws from the conspiracy, *United States v. Wren*, 363 F.3d 654, 663 (7th Cir. 2004), and it is difficult to prove that one has withdrawn other than by becoming a government informant; mere cessation of activity on behalf of the conspiracy is not enough. *Hyde v. United States*, 225 U.S. 347, 369 (1912); *United States v. Paladino*, 401 F.3d 471, 479-80 (7th Cir. 2005); *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964) (Friendly, J.). And finally a small fry prosecuted for membership in a conspiracy is unlikely to obtain a severance of his

trial from that of the ringleaders. See *United States v. Tiem-Trinh*, 665 F.3d 1, 17 (1st Cir. 2011).

In the present case, however, by charging conspiracy in addition to distribution the government handed the defendant his only ground of appeal—a vexing ground because of the difficulty of drawing a clear line between sales, and conspiracies to sell, in particular cases.

The difficulty is illuminated by an antitrust analogy. Section 1 of the Sherman Act punishes contracts, combinations, and conspiracies in restraint of trade, 15 U.S.C. § 1, and the distinction among these terms is unimportant. If a seller signs a contract with a buyer that sets a floor under the retail price at which the buyer may resell the seller's product, the resulting limitation on intrabrand price competition can be challenged under section 1 as a contract in restraint of trade, but equally as a conspiracy in restraint of trade; for "conspiracy" in section 1 is simply a pejorative term for a contract, both "conspiracy" and "contract" signifying an agreement, a meeting of minds. That is equally true when one person agrees to sell illegal drugs to another. Of course to be legally enforceable a contract requires certain formalities, which will not be found in a conspiracy. But their absence is of no moment; a criminal contract is unenforceable whatever form it takes.

The federal drug laws, however, insist on the distinction between a conspiracy and a contract of sale. E.g., *United States v. Vallar*, 635 F.3d 271, 286-87 (7th Cir. 2011); *United States v. Johnson*, 592 F.3d 749, 754-57 (7th Cir. 2010); *United States v. Delgado*, No. 07-41041, 2012 WL 574012, at *7-8 (5th

Cir. Feb. 22, 2012) (en banc); *id.* at *33-38 (dissenting opinion), and cases cited in *id.* at *33 n. 20. As explained in *United States v. Colon*, *supra*, 549 F.3d at 569, quoting *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991), "there are practical reasons for not conflating sale with conspiracy. 'A sale, by definition, requires two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate.'" But "a conspiracy involves more people and can therefore commit more crimes; and it can do so more efficiently, by exploiting the division of labor and by arranging concealment more effectively—sometimes through suborning law enforcers." *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir. 1986).

So there must be more than just a sale of drugs to support an inference of conspiracy, and the question is what more. The answer might seem to depend on how the criminal law draws the line between contract and conspiracy. The line might run between "contract" conceived of as a purely arm's-length relationship and "conspiracy" conceived of as a cooperative relationship—a relationship of mutual assistance. See *United States v. Speed*, 656 F.3d 714, 719 (7th Cir. 2011); *United States v. Townsend*, *supra*, 924 F.2d at 1392. Actually that would be a distinction among types of contract. A spot contract, illustrated in its purest form by a trade on a stock exchange, involves a minimal relationship, because there is only the single transaction and the parties may not even be identified to each other. In contrast, the aptly named "relational contract," such as a long-term requirements contract, creates a continuing relationship flexible enough to

adapt to changes of circumstance that could not have been fully anticipated when the contract was negotiated. See Charles J. Goetz & Robert E. Scott, "Principles of Relational Contracts," 67 *Va. L. Rev.* 1089, 1092-95 (1981). So one way to understand a drug conspiracy is as a relational contract among drug dealers. See *United States v. Lechuga*, *supra*, 994 F.2d at 349 (plurality opinion). Without necessarily endorsing that approach, let us consider on which side of that line the present case falls.

The defendant had bought almost two kilograms of cocaine from a man named Latine over a period of 18 months. Some of the sales had been on credit, and Latine had sometimes allowed the defendant to return cocaine he had bought because it was not of the agreed-upon quality, and when that happened Latine had refunded the purchase price. It is unclear how many sales in total he made to the defendant over the course of their relationship, but from his testimony concerning the amount of each sale a jury could reasonably infer that there had been at least seven sales.

These facts just reveal a commonplace wholesale relationship. The defendant was a retail dealer, which means that he probably had a number of customers and that his sales to them were spot transactions, while he had a continuing relation with his wholesaler, Latine. Sales on credit and returns for refunds are normal incidents of buyer-seller relationships, spot or otherwise; so thus far all we've seen to distinguish the defendant's dealings with Latine from "mere" sales is that the sales were not spot transactions and were wholesale rather than retail sales.

The government adds that there was "mutual trust" between the defendant and Latine, and it cites cases in which our court and other courts have described "mutual trust" as a factor that distinguishes an ordinary drug sale from a drug conspiracy. E.g., *United States v. Kincannon*, 567 F.3d 893, 898-99 (7th Cir. 2009); *United States v. Baugham*, 449 F.3d 167, 173 (D.C. Cir. 2006); *United States v. Washington*, 318 F.3d 845, 852 (8th Cir. 2003). But mutual trust is just an implication of illegal sales on credit; since you cannot sue a buyer who stiffs you in an illegal transaction, you must trust him in order to be willing to extend credit to him. See *United States v. Colon*, *supra*, 549 F.3d at 567-68; *United States v. Baugham*, *supra*, 449 F.3d at 173. It is not an additional factor but rather a way of explaining why sales on credit are a factor in inferring conspiracy. It would be different if mutual trust were being inferred from a familial relationship or some other circumstance distinct from a willingness to make an illegal sale on credit.

But this leaves unanswered the question why willingness to sell illegal drugs on credit is evidence of conspiracy, when it is such a common feature of legal selling. Less trust is involved in legal sales on credit, since the seller has legal remedies; but why should trust be thought indicative of conspiracy? That would imply that sales on credit were made only to coconspirators.

Moreover, parties to an illegal sale *must* trust each other more than is normal in legal sales, even when the sale is for cash rather than on credit: trust each not to rob the other and not to be or to turn government informant.

Since an agreement to commit a crime is a conspiracy, the wholesaling of illegal drugs on credit could be thought to give rise to an automatic inference of conspiracy. The wholesaler knows the retailer will repay the loan by committing the crime of selling the illegal drugs that he's acquired on credit, and by acquiescing the wholesaler becomes a party to the retail sale, which is to say to an agreement to commit a crime, which is a conspiracy. For cases supportive of this approach, see, e.g., *United States v. Vallar*, *supra*, 635 F.3d at 286; *United States v. Rock*, 370 F.3d 712, 714-15 (7th Cir. 2004); *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994); *United States v. Lechuga*, *supra*, 994 F.2d at 350 (plurality opinion); *United States v. Parker*, 554 F.3d 230, 238-39 (2d Cir. 2009). The approach is attractive both conceptually, by aligning conspiracy with an agreement to commit a crime, and as a welcome simplification of doctrine, by drawing a bright line between the retail and wholesale drug trades and treating the relationship between wholesaler and retailer as conspiracy rather than trying to distinguish contract from conspiracy on the basis of "plus" factors that seem mostly makeweights, such as mutual trust when it is just an inference from sales on credit. Application of this approach in the present case would nail the defendant.

And this may be where the law is headed, as the cases just cited indicate. But a number of other cases, such as *United States v. Johnson*, *supra*, 592 F.3d at 755-57, and *United States v. Townsend*, *supra*, 924 F.2d at 1392, reject such a rule.

We needn't choose between the two lines of authority in this case, because there is additional evidence of conspiracy.

Latine's supplier was the defendant's father. He had been the son's wholesale supplier, but they had quarreled and the son had switched to buying from Latine, though the father remained his son's indirect supplier. One evening the defendant by chance saw Latine's car stopped by the side of a road and being searched by police. The defendant telephoned his father to tell him what was happening, and they agreed that Latine's family should be told and should be urged to discard any drugs that Latine might have in the house. The father directed his son to tell the family these things, and also to leave Latine's house promptly after doing so, before the police arrived. He also told his son that he was in touch with a person at the scene of the arrest who was waiting to see whether the police would discover the drugs hidden in Latine's car and arrest him.

We needn't decide whether a conspiracy with the father was formed by the discussion with the son, or indeed pre-existed the discussion (which would be no surprise, since the father was Latine's supplier). It is enough that the episode reveals mutual support and protection grounded in a family relationship that provided linkage that is not a common feature of wholesaling. Cf. *United States v. Murray*, 474 F.3d 938, 941 (7th Cir. 2007). When he learned of Latine's arrest the defendant could simply have cleared out; instead he tried to save Latine's business. The family connection—

the defendant's father being Latine's direct and the son's indirect supplier and the quarrel between father and son being forgotten in a crisis—had forged a relationship between Latine and the defendant that the jury was entitled to characterize as conspiring to distribute drugs rather than merely buying and selling them. *United States v. Rea*, *supra*, 621 F.3d at 608; *United States v. Johnson*, *supra*, 592 F.3d at 755-56. The judgment is therefore

AFFIRMED.