In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2743

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANKLIN BROWN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09-cr-671 — **James B. Zagel**, *Judge.*

ARGUED FEBRUARY 28, 2013 — DECIDED AUGUST 12, 2013

Before MANION, KANNE, and TINDER, *Circuit Judges.*

KANNE, *Circuit Judge.* For five years, Franklin Brown led a
lucrative life in Chicago's cocaine trade. Eventually, however,
fate caught up with him. Federal authorities arrested Brown
and charged him with conspiracy to distribute cocaine. The

jury convicted, and the district court sentenced Brown to nearly twenty-five years in prison. Now, Brown challenges that result. He claims that he was only a customer to his suppliers, as opposed to a co-conspirator. If true, that fact would have prevented a jury from convicting him. Brown also makes a second, related argument: he claims the district court's instructions to the jury provided incorrect guidance on how to distinguish a buyer-seller relationship from a conspiracy. Ultimately, we find both arguments unpersuasive and affirm Brown's conviction.

## I. BACKGROUND

This case traces the relationship between three protagonists: Franklin Brown, Pedro Flores, and Margarito Flores. The Flores brothers (sometimes called "the Twins") ran a massive drug trafficking operation in the Chicagoland area. Yet the Floreses did business with only a select few customers—no more than fifteen, in fact. (R. 190 at 38.) Brown (also known as "Skinny") counted among them. Indeed, Brown was one of the Floreses' "best customers." (*Id.* at 49.) Between 2003 and 2008, Brown bought millions of dollars worth of cocaine from the Twins. No one contests these facts.

The dispute is whether Brown was more than a "customer." Federal authorities did not charge Brown with a substantive drug trafficking crime; rather, they charged Brown with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (R. 1); (R. 105). For this reason, a jury could convict Brown only if they found him a co-conspirator in the Floreses' trafficking operation—a status that requires more involvement than a mere customer.

Thus, characterizing Brown's relationship with the Twins sparked intense debate at Brown's trial. For unknown reasons, those with the clearest information on Brown's involvement—the Floreses—did not testify. This omission is particularly notable due to the Floreses' rigid business practices. The Twins used couriers to handle physical transactions but reserved *all* power to negotiate for themselves. (R. 195 at 89–90); (R. 190 at 36). Consequently, without the Floreses' own accounts, the government had to rely on second-hand information from couriers to show Brown's role in the organization.

The couriers provided useful testimony, however. By piecing together their accounts, the jury could, for example, grasp the massive extent of Brown's purchases from the Floreses. One courier, Jorge Llamas, stated that, over a two-year period, he met Brown on approximately forty occasions, each time to deliver between twenty and one hundred kilograms of cocaine. (R. 190 at 69.) Another courier, Cesar Perez, testified to making between thirty and forty deliveries, each at least ten kilograms, during a separate three-year period. (R. 195 at 33–34.) At least two other couriers were also responsible for delivering cocaine to Brown. (R. 190 at 59–60.)

According to the couriers, Brown rarely provided full cash payment at the time of delivery. For instance, Brown once provided Perez with only $26,000 for around 57 kilograms of cocaine. (R. 195 at 54–56.) Throughout Brown's entire relationship with the Twins, the price of a kilogram of cocaine in Chicago never dropped below about $16,000. (R. 192 at 111.) Thus, even at that lowest price, 57 kilograms was worth at least $912,000—far more than the $26,000 Brown provided at delivery. Conversely, Llamas testified to several meetings at

which Brown dropped off five- to seven-figure payments but did not receive any drugs. (R. 190 at 69.) A third courier, Hector Simental, similarly testified to receiving several payments ranging from $250,000 to $1.3 million from Brown, all without a corresponding delivery of drugs. (R. 191 at 141–43.) Simental also spoke about an accounting ledger in which Brown's financial status with the Twins was tracked. (*Id.* at 152–62.)

Yet Brown's involvement with the Floreses did not end there. Brown received far more than drugs from the Twins. The Floreses frequently had couriers provide prepaid cell phones to their business associates to facilitate communication with the Twins. (*Id.* at 110–11.) Llamas delivered such phones to Brown. (R. 190 at 71.) The Twins also had Llamas give Brown a Chevrolet HHR specially outfitted with a secret compartment for concealing drugs or money. (*Id.* at 72–74.) The government never presented evidence that Brown used the HHR for subsequent drug trafficking, but it did introduce records showing that Brown had taken out insurance on the vehicle. (R. 192 at 41–42.) Finally, an investigator recovered title documents for a Jeep Grand Cherokee with a similar secret compartment from Brown's garbage. (*Id.* at 34–38); (R. 190 at 86). Another courier for the Twins—although not one who delivered cocaine to Brown—was known to drive this Jeep. (R. 190 at 59–60, 85–88.)

When Brown's trial came to a close, the district court instructed the jury on the difference between a conspiracy and a buyer-seller relationship. Earlier in the proceedings, the wording of this instruction had raised significant disagreement between Brown and the government. When the district court

instructed the jury, it decided to combine the two proposed approaches (more details on the specific wording later).

After deliberating, the jury found Brown guilty of conspiracy. (R. 114.) Brown moved for a judgment of acquittal and argued that the government failed to provide sufficient evidence. (R. 117.) Brown also moved for a new trial based upon several other errors purportedly made by the district court. (R. 130.) The district court denied both motions, (R. 138), and sentenced Brown to 292 months in prison, followed by 120 months of supervised release, (R. 152). Brown subsequently appealed. (R. at 153.)

## II. ANALYSIS

Brown presents two arguments on appeal. First, he claims that the government did not present sufficient evidence to convict him of conspiracy. Second, he argues that the district court's buyer-seller jury instruction misstated the law and misled the jury. We address each argument below but in reverse order. To determine whether the jury instruction was appropriate, we must discuss the case law on conspiracy. Having that discussion first will later make it easier to determine whether the evidence in this case was sufficient.

*A. Buyer-Seller Jury Instruction*

Brown and the government cite seemingly disparate cases for the standard of review that governs challenges to jury instructions. Yet neither makes clear that we review instructions in two steps. First, we review *de novo* whether a particular jury instruction "accurately summarize[s] the law." *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013). If so, then

we "examine the district court's particular phrasing of the instruction for abuse of discretion." *Id.* Under the second step, we reverse "only if it appears both that the jury was misled and that the instructions prejudiced the defendant." *Id.*

*1. Accuracy of law*

We begin by assessing whether the district court's buyer-seller instruction accurately summarized the law—a difficult proposition. Our case law on buyer-seller relationships has many dissonant voices. To determine the accuracy of the district court's work, however, we will attempt to harmonize those voices into a well-blended choir.

*a. Case law on buyer-seller relationships*

In October 2012, our circuit released a revised set of pattern jury instructions for use in criminal cases. Committee on Federal Criminal Jury Instructions for the Seventh Circuit, *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012), *available at* http://www.ca7.uscourts.gov/Pattern_Jury_Instr/ 7th_criminal_jury_instr.pdf. One notable revision was to Instruction 5.10(A), which distinguishes buyer-seller relation-ships from conspiracies. *Id.* at 73–74. This distinction may seem difficult to grasp at first. It stems, however, from an important tenet of criminal law: conspiracy is a separate offense from the underlying crime. *See, e.g.*, 21 U.S.C. § 846; 18 U.S.C. § 43(a); 18 U.S.C. § 32(a)(8).

Conspiracy is the extra act of *agreeing* to commit a crime. *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003); *Smith v. United States*, 133 S. Ct. 714, 719 (2013). "That agreement is a 'distinct evil,'" *Jimenez Recio*, 537 U.S. at 274, because a group

of criminals often pose a greater danger than an individual, *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991). By working together, criminals capitalize on economies of scale, which facilitate planning and executing crimes—thus making it more likely that a group will complete its unlawful aim. *Id.*; *see also Jimenez Recio*, 537 U.S. at 275. For this reason, we punish conspiracies separately from the underlying offense, whether or not that crime comes to fruition. *Jimenez Recio*, 537 U.S. at 274.

Drug sales complicate the situation. A drug sale is itself an agreement: a buyer and seller come together, agree on terms, and exchange money or commodities at the settled rate. *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004). But, although the substantive trafficking crime is an agreement, it cannot also count as the agreement needed to find conspiracy. *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009); *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc) (lead opinion). Rather, conspiracy to traffic drugs requires an agreement to advance *further* distribution. *United States v. Villasenor*, 664 F.3d 673, 679–80 (7th Cir. 2011). For example, the buyer could agree to resell the drugs at the retail level. *United States v. Nunez*, 673 F.3d 661, 665–66 (7th Cir. 2012).

Often, the government will have only circumstantial evidence of a further agreement, which requires the jury to make an inference to convict. Defendants readily challenge the sufficiency of such evidence, which has led to an array of cases in our court that parse out when the inference was permissible. Answering some of those questions proved easy. Mere knowledge of further illegal use, for example, may make the

seller an aider and abettor to further drug crimes committed by the buyer but not a co-conspirator. *United States v. Moreland*, 703 F.3d 976, 984 (7th Cir. 2012). Being a co-conspirator requires more. As the Supreme Court aptly put it: a co-conspirator has "a stake in the venture" and therefore exhibits "informed and interested cooperation." *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943) (internal quotation marks omitted). For short-hand, we have referred to arrangements without this substantive relationship as "buyer-seller relationships," which contrast with conspiracies.

Determining whether someone has "a stake in the venture" is easier said than done—especially with circumstantial evidence. To assist juries, the previous version of our pattern instruction on buyer-seller relationships provided a list of factors to consider. Committee on Federal Criminal Jury Instructions for the Seventh Circuit, *Pattern Criminal Federal Jury Instructions for the Seventh Circuit* 93 (1998), *available at* http://www.ca7.uscourts.gov/pjury.pdf. The list included: "[w]hether the transaction involved large quantities," "[w]hether the parties had a standardized way of doing business over time," "[w]hether the sales were on credit or on consignment," "[w]hether the parties had a continuing relationship," "[w]hether the seller had a financial stake in a resale by the buyer," and "[w]hether the parties had an understanding that the [goods] would be resold." *Id.* In our cases, we used a similarly worded list but often added "the level of mutual trust between the buyer and seller." *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001); *accord United States v. Nubuor*, 274 F.3d 435, 440 (7th Cir. 2001). We explained that none of the factors were dispositive but pro-

vided no further guidance on weighing the various considerations. *See, e.g.*, *United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001).

Recently, we became concerned with that approach. We recognized that most of the factors did not actually distinguish conspiracies from buyer-seller relationships. Consider an example using Wal-Mart. *See United States v. Colon*, 549 F.3d 565, 568–69 (7th Cir. 2008). Most private citizens do not have a "stake" in Wal-Mart. They are merely casual buyers. Yet many of those same people regularly conduct standardized transactions with the discount retailer (two factors from the old pattern instruction). For example, a man can buy two sticks of deodorant for $3.49 each, every other Friday. These transactions, despite exhibiting frequency, regularity, and standardization, do not evince the substantial relationship entailed in a conspiracy. *See id.*; *see also Nunez*, 673 F.3d at 665. Thus, although circumstantial evidence can prove conspiracy, *United States v. Carrillo*, 435 F.3d 767, 776 (7th Cir. 2006), several factors in the old pattern instruction did not permit that inference beyond a reasonable doubt, *United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010). Rather, those factors were equally consistent with a buyer-seller relationship. *Id.*

In response, we identified a new, nonexhaustive list of characteristics that more precisely pinpoint the distinction. These considerations include:

> sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other

on the conduct of the other's business, or an agree-
ment to warn of future threats to each other's busi-
ness stemming from competitors or law-enforce-
ment authorities.

*Id.* at 755–56 (internal footnote omitted); *accord Colon*, 549 F.3d
at 568–70. Two considerations warrant further discussion here:
sales on consignment and sales on credit. In the former, the
seller permits the buyer to return unsold drugs. *Johnson*, 549
F.3d at 755 n.5. The latter is more familiar—the buyer "fronts"
the drugs but expects payment for the entire shipment at a
later date. *Id.* at 756 n.5. In both, the seller has affirmatively
chosen terms favorable to the buyer, which demonstrates the
"informed and interested cooperation" discussed earlier. *Direct
Sales*, 319 U.S. at 713.

Important differences, however, distinguish consignment
and credit sales. In *United States v. Johnson*, we described
consignment sales as "quintessential evidence of a conspiracy."
549 F.3d at 755 n.5. "[A] jury could easily infer an agreement to
distribute" from that arrangement because "the supplier will
not get paid until the middleman resells the drugs." *Id.* at
755–56 n.5. In other words, the buyer and seller have en-
meshed their interests. To that commentary, we add that a
consignment arrangement also exhibits another key attribute
we have stressed in identifying conspiracies: an "actively
pursued course of sales." *United States v. Suggs*, 374 F.3d 508,
518 (7th Cir. 2004); *accord Direct Sales*, 319 U.S. at 712 n.8
(discussing "stimulation or active incitement to purchase" as
indicative of a conspiracy). The seller's favorable terms
encourage the buyer to accept more drugs to sell at the retail

level, and, in the long-term, encourage the buyer to continue the business relationship.

Credit sales, in contrast, do not necessarily permit an inference of conspiracy. *Johnson*, 592 F.3d at 756 n.5. Unlike consignment sales, credit sales are not always premised on further distribution. For example, a buyer could purchase a quantity consistent with personal consumption. If the buyer indeed uses the drugs himself, the seller has not actively incited and agreed to further distribution. In addition, the buyer and seller's interests would not be enmeshed in the same way, since the buyer would not be reselling the product to pay back the debt. Therefore, to prove conspiracy, more evidence is required than a single sale, on credit, in a quantity consistent with personal consumption. That additional proof can come in a variety of forms—including factors from the old pattern jury instruction, such as frequency and quantity. In other words, once the government has shown some evidence that can distinguish a conspiracy from a buyer-seller relationship (i.e. something akin to those examples found in our new list), then other circumstantial evidence can bolster that argument, including evidence that would not, by itself, distinguish a conspiracy. *Id.*; *United States v. Vallar*, 635 F.3d 271, 287 (7th Cir. 2011).

There is disagreement in our case law, however, over what other evidence, when combined with a credit arrangement, is sufficient to infer conspiracy. One proposition seems generally uncontroversial: if a person buys drugs in large quantities (too great for personal consumption), on a frequent basis, on credit, then an inference of conspiracy legitimately follows. *See, e.g.*, *Johnson*, 592 F.3d at 756 n.5; *United States v. Zaragoza*, 543 F.3d

943, 948–49 (7th Cir. 2008); *United States v. Bender*, 539 F.3d 449, 453–54 (7th Cir. 2008); *United States v. Bustamante*, 493 F.3d 879, 885 (7th Cir. 2007); *United States v. Medina*, 430 F.3d 869, 881–82 (7th Cir. 2005).[1]

Less clear is what combinations of those three characteristics—a credit arrangement, a large quantity, and frequent sales—are sufficient. *Johnson*, for example, implies all three are necessary. In that case, we said that evidence "*becomes* sufficient" when there is an "ongoing wholesale buyer-seller relationship" on credit, which the opinion defines as "repeat purchases" of "large quantities" on credit. *Johnson*, 592 F.3d at 756 n.5 (emphasis added); *accord Vallar*, 635 F.3d at 287. If evidence only *becomes* sufficient when all three characteristics are present, it would seem all three are required for a permissible inference.

Other cases debate the sufficiency of lesser combinations. For example, does a *single* transaction, in a wholesale quantity, on credit, permissibly support an inference of conspiracy? We have cases that answer both ways, each supporting its conclusion with other case-specific considerations. *See United States v. Smith*, 393 F.3d 717, 719–20 (7th Cir. 2004) (single large transaction on credit sufficient when middleman referred to

---

[1] In *United States v. Nunez*, we suggested that perhaps these three characteristics "just reveal a commonplace wholesale relationship." 673 F.3d at 665. Yet, only a few paragraphs later, the opinion suggests that "wholesaling of illegal drugs on credit" might "give rise to an *automatic* inference of conspiracy." *Id.* (emphasis added). The conflicting statements are both *dicta*, however. The court declined to decide the issue and instead relied on other grounds to affirm the conspiracy conviction. *See id.* at 666.

defendant-supplier and his colleagues as "my boys," and offered to get a larger quantity from defendant-supplier when amount sold to informant came up short); *United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir. 1993) (single large credit transaction sufficient when parties had a history of several other cash purchases); *United States v. Fort*, 998 F.2d 542, 546 (7th Cir. 1993) (single large credit transaction sufficient when buyer promised to make further purchases in the future); *United States v. Baker*, 905 F.2d 1100, 1106–07 (7th Cir. 1990) (single large transaction on credit insufficient when buyer "unilaterally changed the deal from cash to credit"). Yet another series of cases disagree over whether a credit arrangement *alone* is sufficient to infer conspiracy. *Compare United States v. Dean*, 574 F.3d 836, 843 (7th Cir. 2009) ("the evidence of fronting alone may be sufficient to support [the defendant's] conviction"), *with Johnson*, 592 F.3d at 756 n.5, *and United States v. Kozinski*, 16 F.3d 795, 809 (7th Cir. 1994) ("standing alone, the credit transactions are insufficient evidence of an agreement for [the defendant] to be a distributor"). Reflecting this tension, the Committee charged with drafting the new pattern jury instruction diplomatically noted "that particular factors do not always point in the same direction." Committee Comment, *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012), *supra*, at 73–74.

Admittedly, much of the confusion stems from our own imprecision. For example, in *United States v. Moreland*, we discussed the significant support for an approach that "infers conspiracy from wholesale sales on credit." 703 F.3d at 985. According to the opinion, "wholesale sales on credit" represents "two factors" from our old list (a large quantity and a

credit arrangement), although the plural use of "s" in "sales" could also be read to imply that multiple purchases are required for that inference. *Id.* Similarly, in *United States v. Vallar*, we noted the presence of wholesale quantities early in the opinion, 635 F.3d at 277, but, when describing why we upheld the conviction, we referred only to the fact that there were repeated purchases on credit, *id.* at 287.

Even though many of our cases do not state the legal standard in precisely the same way, however, most of them would have reached the same outcome under each other's jurisprudence. In *Vallar*, for example, the defendant engaged in repeated sales, in wholesale quantities, on credit. *Id.* at 277, 287. These three characteristics would satisfy even the restrictive test set out in *Johnson*, despite the fact that the opinion did not explicitly mention all three when explaining its reasoning. The same is true for many other cases. *See, e.g.*, *Dean*, 574 F.3d at 843; *United States v. Frazier*, 213 F.3d 409, 415 (7th Cir. 2000); *United States v. Ferguson*, 35 F.3d 327, 331 (7th Cir. 1994); *United States v. Cabello*, 16 F.3d 179, 182 (7th Cir. 1994).

That latent consistency suggests we are informally using a "totality of the circumstances" approach. Indeed, the new pattern jury instruction further buttresses that conclusion. The instruction deliberately uses open-ended phrasing ("the government must prove that the buyer and seller had [a] joint criminal objective"), which encourages case-specific analysis. *Pattern Criminal Jury Instructions of the Seventh Circuit* (2012), *supra*, at 73. Yet our case law makes it sound otherwise—as if we are trying to outline a bright-line approach based on specifically dictated considerations. These two approaches

raise the classic dichotomy between judicial flexibility and doctrinal clarity. *See* Pierre Schlag, *Rules and Standards*, 33 *UCLA L. Rev.* 379, 383–89 (1985). Either approach has merit, but a clearer statement of our methodology would significantly aid both litigants and district judges.

We will thus make such a statement. The underlying question beneath all buyer-seller cases is whether there was a conspiracy. We discuss buyer-seller relationships at such length because they do *not* qualify as conspiracies. People in a buyer-seller relationship have not agreed to advance further distribution of drugs; people in conspiracies have. That agreement is the key. Agreements come in infinite varieties, however. Consider an analogy using contracts—another form of agreement. Every year, businesses form countless individualized contracts. This variation does not change the fact that each is still an agreement.

Our approach to conspiracies must—and does—account for the similar diversity in criminal agreements. For this reason, we consider the totality of the circumstances. We take into account all the evidence surrounding the alleged conspiracy and make a holistic assessment of whether the jury reached a reasonable verdict. True, repeated consideration of similar circumstances seems to have identified a few *per se* rules. As discussed earlier, either a consignment arrangement, or a relationship exhibiting all three *Johnson* factors—multiple, large-quantity purchases, on credit—are widely accepted as sufficient proof of a trafficking conspiracy. Indeed, when either of those conditions are satisfied, a reasonable jury can make that inference. Notice, though, that we develop *per se* rules by

watching similar situations repeat themselves—and thus seeing that the totality of the circumstances leads to the same conclusion.

Admittedly, our list of example considerations may make it sound as if we are checking off boxes and only looking for specified indicia. That is not the case. The fact that so many of our cases reach consistent outcomes, despite inconsistent, or even contradictory, statements of the weight various considerations hold, demonstrates that the list is merely a starting point for our analysis. If we were to give that list talismanic power, we would be liable to fixate on particular kinds of facts at the expense of other informative evidence. Thus, "[r]ather than needlessly adopt[ing] an absolute standard that cannot be applied intelligibly," we allow the circumstances of each case to speak for themselves. *Lechuga*, 994 F.2d at 357 (Kanne, J., concurring). And in so doing, our specifically focused analyses do not lose sight of the larger picture—deciding whether the jury reasonably discerned an agreement to further trafficking of drugs.

*b. The district court's instruction*

The preceding discussion illustrates the immense challenge of trying to craft a jury instruction that captures our case law on buyer-seller relationships. The district judge had two paragraphs to summarize what has taken several pages here. Furthermore, Brown's case arose at a particularly difficult time. The new pattern instruction, although proposed, had not yet been adopted. The government had also informed the court that the proposed instruction confused another jury in a different case. (R. 192 at 211–12.) Alternatively, the old instruc-

tion was still available but had received sharp criticism from our court. *See generally Colon*, 549 F.3d 565.

Despite the district court's unenviable task, we must still review the accuracy of the court's instruction *de novo*. *Dickerson*, 705 F.3d at 688. We begin by comparing Brown's proposed instruction with the one selected by the district court. Brown's instruction tracked the new (at the time, proposed) pattern instruction verbatim. Brown's proposed instruction read:

> A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of cocaine do not enter into a conspiracy to possess cocaine with intent to distribute simply because the buyer resells cocaine to others, even if the seller knows that the buyer intends to resell the cocaine.
>
> To establish that a buyer knowingly became a member of a conspiracy with a seller to possess cocaine with intent to distribute, the government must prove that the buyer and seller had the joint criminal objective of distributing cocaine to others.

(R. 119.) In response, the government proposed a different instruction. The district court decided to combine the language of the two proposed instructions. The instruction issued by the court read as follows:

> A conspiracy to distribute drugs or possess drugs with intent to distribute requires more than simply

an agreement to exchange money for drugs which the seller knows will be resold.

In order to establish that a defendant knowingly conspired to distribute drugs or possess drugs with intent to distribute with a person from whom the defendant bought drugs, the government must prove that, in addition to agreeing to buy drugs, the defendant further agreed to participate with the seller in an arrangement involving mutual dependence, cooperation or assistance in distributing drugs. Such an agreement may be proved by evidence showing sales on credit, in which the buyer is permitted to pay for all or part of the drugs after the drugs have been re-sold, coupled with other evidence showing mutual cooperation and an ongoing arrangement between the defendant and the seller.

(R. 115 at 23.)

The key differences between the two instructions come in the last two sentences. First, the version used by the court added the phrase, "the government must prove that, in addition to agreeing to buy drugs, the defendant further agreed to participate with the seller in an arrangement involving mutual dependence, cooperation or assistance in distributing drugs." (*Id.*) This sentence accurately states the law. *See Nunez*, 673 F.3d at 664 (describing a conspiracy as "a cooperative relationship" and a "relationship of mutual assistance"); *Townsend*, 924 F.2d at 1392 (describing members of a conspiracy as either "mutually dependent on one another" or

"render[ing] mutual support"); *see also Suggs*, 374 F.3d at 518 (describing a conspiracy as a "shared stake in the illegal venture," along with "a prolonged and actively pursued course of sales"); *accord United States v. Fuller*, 532 F.3d 656, 662 (7th Cir. 2008).

The district court's other major modification to Brown's proposed instruction is similarly grounded in our case law. In the last sentence of the instruction, the district court said, "[s]uch an agreement may be proved by evidence showing sales on credit, … coupled with other evidence showing mutual cooperation and an ongoing arrangement between the defendant and the seller." (R. 115 at 23.) This sentence charts a tripartite avenue to conviction: (1) sales on credit; (2) "an ongoing arrangement"; and (3) "mutual cooperation." (*Id.*)

That guidance accurately summarizes the law. Several cases have found two of those characteristics—repeated transactions ("an ongoing arrangement") on credit—as sufficient to affirm a conspiracy conviction. *See, e.g., Vallar*, 635 F.3d at 287; *Ferguson*, 35 F.3d at 331. Thus, requiring repeated sales on credit, plus "mutual cooperation," exceeds what those cases require. Furthermore, the added characteristic ("mutual cooperation") speaks to the spirit of what we are looking for— a "shared stake in the illegal venture," along with an "actively pursued course of sales." *Suggs*, 374 F.3d at 518. The phrase allows for case-specific analysis, thereby enabling the jury to consider relevant indicia beyond the specific kinds of facts previously articulated in our cases.

Importantly, in the district court's instruction, repeated transactions and "mutual cooperation" are used to bolster an

inference of conspiracy only after credit sales have been shown. (R. 115 at 23.) Thus, despite what Brown argues, it does not matter that repeated sales and "mutual cooperation" might not, on their own, distinguish conspiracies from buyer-seller relationships. As our earlier discussion made clear, once some evidence that distinguishes conspiracies from buyer-seller relationships is shown (here, credit sales), the jury can use other non-distinguishing circumstantial evidence to buttress that inference. *Johnson*, 592 F.3d at 756 n.5. The district court's instruction gave the jury precisely that guidance.

For these reasons, we find the district court's instruction accurately summarized the law on buyer-seller relationships.

*2. Specific phrasing*

Under the second step of our analysis, we must also decide whether the district court's phrasing of the instruction constituted an abuse of discretion. *Dickerson*, 705 F.3d at 688. It was not. The case law on this issue is muddled, and the district court tried to use phrases that the jury would find meaningful. We do not feel those choices misled or confused the jury in a way that warrants reversal.

Brown first argues that the court's instruction did not specifically state that the jury must acquit if it found only that the seller knew the buyer would resell the drugs. Although true, that omission would not have confused the jury. The first sentence of the instruction explicitly stated, "[a] conspiracy to distribute drugs or possess drugs with intent to distribute requires more than simply an agreement to exchange money for drugs which the seller knows will be resold." (R. 115 at 23.) Thus, the instruction makes clear that mere knowledge of

further sales is not a conspiracy. Furthermore, the jury also received an instruction that, if it did not find the existence of a conspiracy beyond a reasonable doubt, then it must acquit. (*Id.* at 20.) Therefore, when considered in tandem, these two instructions provide the guidance Brown claims was lacking.

Brown also argues that the instruction invoked an impermissible multi-factor approach. This argument misconstrues our precedent. Some of our opinions on buyer-seller instructions indeed criticize a multi-factor approach to this issue. *See, e.g.*, *Nunez*, 673 F.3d at 664–66; *Colon*, 549 F.3d at 567–70. This criticism, however, was primarily aimed toward the old pattern instruction. *See Nunez*, 673 F.3d at 664–66 (criticizing several factors in the old instruction); *Colon*, 549 F.3d at 567–70. As discussed earlier, that instruction not only provided no guidance on how to weigh its various factors, but it also included several factors that did not actually distinguish conspiracies from buyer-seller relationships. Our cases do not prohibit a multi-factor approach *per se*. Rather, district courts must be careful to avoid the maladies that plagued our old pattern instruction. The court in this case certainly did so.

Finally, Brown alleges that the district court abused its discretion by even offering an instruction that discussed credit sales, because, according to Brown, the government did not show any evidence of credit sales. This argument serves as an apt transition into the second section of this opinion, which discusses sufficiency of the evidence. More details can be found in the section below, but, for now, we simply state that there was sufficient evidence for the court to include credit sales in the instruction.

Thus, for the reasons listed above, we find the wording of the district court's buyer-seller instruction was not an abuse of discretion.

*B. Sufficiency of the Evidence*

Brown also challenges the sufficiency of the evidence against him. We accord "great deference" to jury verdicts. *United States v. Love*, 706 F.3d 832, 837 (7th Cir. 2013). Consequently, "we review the evidence in the light most favorable to the government" and will reverse only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Here, the government needed to prove (1) that Brown agreed with another person to commit an unlawful act; and (2) that Brown knowingly and intentionally joined the agreement. *See Avila*, 557 F.3d at 814.

As Brown rightly notes, the government did not introduce any evidence of what Brown did with the drugs after he purchased them from the Floreses. Therefore, any further distribution (and any agreement to that distribution) had to be inferred. For that proposition, the government relied on credit sales, along with several other bits of circumstantial evidence. Brown claims that these pieces did not allow a reasonable jury to convict beyond a reasonable doubt. We disagree.

Brown begins by arguing that a reasonable jury could not have concluded that he bought his drugs on credit from the Twins. The government responds that Brown waived this argument. For support, the government cites Brown's motion for a new trial, which stated that "the evidence adduced at trial established illegal drug sales on credit." (R. 130 at 5.)

We cannot accept the government's argument on this close issue. Brown vigorously argued throughout the trial, as well as in his motion for a judgment of acquittal, that the evidence did *not* show sales on credit. As the government acknowledges, Brown's new trial motion incorporated by reference all objections and positions taken during trial, which would therefore include those previous protestations. (*Id.* at 1.) Given that waiver principles are liberally construed in the defendant's favor, *United States v. Anderson*, 604 F.3d 997, 1002 (7th Cir. 2010), we are not convinced that Brown knowingly and intentionally waived this argument, *see United States v. Olano*, 507 U.S. 725, 733 (1993).

Considering Brown's argument, however, does not mean we are persuaded by it. Rather, we find a rational jury could have concluded that Brown purchased drugs on credit. For example, Perez testified that he once delivered approximately 57 kilograms of cocaine to Brown and received only $26,000 in return. (R. 195 at 54–56.) Yet that shipment was worth at least $912,000. (R. 192 at 111.) As another example, Simental testified that he received money from Brown but never delivered drugs to him. (R. 191 at 141–43.) These payments were usually more than $250,000 and were sometimes as much as $1.3 million. (*Id.*) Simental also testified to the contents of a ledger in which Brown's financial status with the Twins was tracked. (*Id.* at 152–62.)

Brown raises several concerns about this evidence. First, he argues that these transactions could have represented prepayments for future shipments rather than post-payments for shipments received on credit. Brown also contests the contents

of the ledger. The entries are all abbreviated, including the ambiguous "Sky," which Simental testified referred to Brown's nickname, "Skinny." (*Id.* at 205–208.)

As to Brown's first argument about prepayments, we do not see how it would help his case. Even if Brown had prepaid for the drugs, his interests would still be enmeshed with the Floreses' in the same way as with a credit arrangement, only with the roles reversed. As to the other argument (and to the first, if it could help Brown), we note that Brown's account *could* have been true. But a reasonable jury could have also found, beyond a reasonable doubt, the government's version of the story. And because a reasonable jury could make that conclusion, there was sufficient evidence that Brown purchased drugs on credit. This is not speculation, as Brown claims, but a legitimate inference grounded in evidence.

Furthermore, the government's evidence of conspiracy encompassed far more than just a credit arrangement. First, the couriers testified to repeated transactions in large quantities. Perez said that he made deliveries to Brown about thirty to forty times and that each shipment was more than ten kilograms. (R. 195 at 33–34.) Similarly, Llamas testified that he also (and independently) met with Brown thirty to forty times over the course of two years, either to deliver drugs or receive cash payments. (R. 190 at 69.) Finally, Simental testified to ten transactions in three months, in which he received payments from Brown between $250,000 and $1.3 million. (R. 191 at 141–43.) When considered together, this evidence falls into one of our *per se* rules, which permits an inference of conspiracy after demonstrating repeated transactions, in wholesale quantities, on credit.

Even beyond the standard considerations discussed in our case law, situation-specific circumstances further show just how integral a part Brown played in the Floreses' venture. Llamas, for example, testified that he delivered prepaid cell phones to Brown so that Brown could use them to contact the Twins. (R. 190 at 71.) Llamas also testified that the Twins provided Brown with a specially outfitted Chevrolet HHR that had a "trap" to conceal drugs. (*Id.* at 73.) Brown contests this evidence. He claims, for instance, that the government provided no evidence that Brown actually *used* the HHR to distribute drugs. He also notes that the government failed to provide evidence that Brown had not paid the Floreses for the HHR through an arms-length transaction.

Again, although the jury could have believed Brown's version, it also could have believed the government's version beyond a reasonable doubt. Evidence showing that Brown took out insurance on the HHR strongly implies that Brown used it. (R. 192 at 41–42.) And given that the vehicle had a special compartment for hiding drugs, if Brown used the HHR, it would be reasonable to infer that he used it to distribute drugs. Also, the millions of dollars worth of business Brown was providing the Twins could lead a reasonable jury to conclude that the Twins gave Brown the vehicle as a gift to aid in further distribution. After all, the more Brown sold, the more money the Floreses would make. In this way, the Floreses had a "shared stake in the illegal venture," along with an "actively pursued course of sales." *Suggs*, 374 F.3d at 518; *accord Fuller*, 532 F.3d at 662. As we have demonstrated, a rational jury could have come to this conclusion. Therefore, the evidence against Brown was sufficient for conviction.

As a final note, we mention the Jeep Grand Cherokee. In May 2007, another courier in the Flores drug conspiracy was pulled over while driving a Jeep Grand Cherokee with a hidden trap for concealing drugs. (R. 190 at 85–88); (R. 192 at 27). An investigator later found the title documents for this vehicle in Brown's trash. (R. 192 at 34–38.) The fact that Brown possessed these documents shows substantial involvement in the Floreses' organization, especially given that the courier known to drive the Jeep was one who did not even make deliveries to Brown. (R. 190 at 59–60, 85–88.) This detail is but one more piece of support for the jury's verdict.

Given the above, a jury could rationally conclude, beyond a reasonable doubt, that Brown conspired with the Floreses.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Brown's conviction.