NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2013
Decided September 18, 2013

**Before**

FRANK H. EASTERBROOK, *Chief Judge*

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 13-1352

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *Plaintiff–Appellee*, <br><br> *v.* <br><br> CHAD NOBLE, <br> *Defendant–Appellant*. | Appeal from the United States District Court for the Southern District of Indiana, Terre Haute Division. <br><br> No. 2:11-cr-00009-JMS-CMM-05 <br><br> Jane E. Magnus-Stinson, <br> *Judge*. |

**O R D E R**

A jury in the Southern District of Indiana found Chad Noble guilty of conspiring to possess and distribute methamphetamine. *See* 21 U.S.C. §§ 846, 841(a)(1). On appeal he argues that the government proved only a buyer–seller relationship between him and one of his alleged coconspirators. Though the evidence is slim, our recent decision in *United States v. Brown*, No. 12-2743, 2013 WL 4048243 (7th Cir. Aug. 12, 2013), clarifies the law in this area and controls the outcome of this case. Thus, we affirm Noble's conviction.

In August 2010 an Illinois state trooper stopped Noble for a traffic violation in the Southern District of Illinois, about 60 miles from Effingham. The defendant, driving a rental car, was en route to his home in Terre Haute, Indiana, from Dallas, Texas. He consented to a search of the car and the duffle bag inside the vehicle, though nothing incriminating was found. Noble was released, but the trooper impounded the car and called for a tow because Noble did not have a valid driver's license. (How he rented the car without one is unclear.) Noble was given a ride to Effingham from the tow-truck driver, but the trooper remained suspicious and alerted authorities there to watch him. Noble's mother met him at a gas station in Effingham, and the two were heading away from town in her car when the surveillance team executed another traffic stop. A drug dog alerted to the car, and this time a search of Noble's duffle bag turned up methamphetamine (later testing would confirm that the mixture contained 337 grams of pure methamphetamine). Noble was arrested on a state drug charge. Although he posted bond, he soon was retaken into state custody and incarcerated on an unrelated matter. When he was paroled in March 2011, federal authorities stepped in.

What could have been a routine prosecution for possession of methamphetamine with intent to distribute, 21 U.S.C. § 841(a)(1), instead resulted in a four-day jury trial and this appeal. Federal prosecutors in the Southern District of Illinois had venue over the substantive offense, *see* U.S. CONST. art. III, § 2, cl. 3; FED. R. CRIM. P. 18, yet they deferred to colleagues in the Southern District of Indiana who lumped Noble with thirteen others in a stand-alone conspiracy charge. The federal prosecutors in Indiana alleged that Noble's possession of methamphetamine in Illinois was part of a conspiracy which ran from February 2010 through April 2011. Twice already Noble had been convicted of a felony drug offense, so the amount of pure methamphetamine seized from his duffel was enough to mandate a life sentence. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 851. Thus the government's charging strategy increased its evidentiary burden without raising the stakes against Noble.

He alone went to trial. A codefendant, Greg Miller, negotiated a plea deal and became the government's star witness. Miller had been dealing methamphetamine even before meeting Noble and was the initial target of investigators in the Southern District of Indiana. Miller testified that he became disenchanted with the quality of the product from his original supplier, so he followed the advice of a mutual friend to buy instead from Noble. The defendant agreed to front up to eight ounces of methamphetamine at a time, and Miller—by his account—soon became Noble's principal customer. Miller estimated that Noble had sold him methamphetamine about a dozen times between the spring of 2010 and Noble's arrest in August 2010. On one occasion, Miller recounted, he

drove Noble to a Chicago barbershop and got his hair cut while Noble acquired a pound of methamphetamine from an unknown supplier.

Miller typically used his cell phones—which investigators were monitoring—to order methamphetamine from Noble. At trial the government played recordings of those calls. In one, Noble and Miller planned future methamphetamine deals that would get Miller out of a financial slump. Another time, Noble applauded Miller for "doing right" to elude police detection by changing phones frequently. And on one occasion Noble admonished Miller—addressing him by the familial term "cuz"—to "clean the house out" after one of Miller's distributors was arrested with methamphetamine Miller had supplied. Noble also offered to investigate and report to Miller the status of the jailed distributor.

Testimony about the Effingham seizure consumed much of the trial, but Miller never asserted that those drugs were destined for him (in fact, Miller had thought Noble was in St. Louis buying marijuana, not in Dallas getting methamphetamine). All that Miller said about Effingham is that he loaned the defendant $9,000 to post bond with the expectation that Noble would "get back out on the streets" and sell to his other customers to repay the debt. (A second codefendant, also testifying as part of a plea agreement, opined that Miller's apparent generosity had been a ploy to discourage Noble from turning informant.) Miller continued communicating by phone with the defendant during his incarceration. And five or six times he sent Noble money for his commissary account because, as Miller put it, they "did business together" and "had a pretty good business relationship." After Noble's release from state prison, he and Miller discussed resuming their previous dealings, but the two men were arrested on the federal indictment before those plans were executed.

These facts are all that link Noble to the alleged conspiracy. The other eleven codefendants dealt only with Miller, and, as far as the evidence shows, Noble knew only two of them. Thus, the government's case against Noble turns entirely on his dealings with Miller. Noble introduced no evidence.

The jury found that the conspiracy involved at least 50 grams of actual methamphetamine and 500 grams of a mixture containing methamphetamine. After the verdict Noble moved for a judgment of acquittal, *see* FED. R. CRIM. P. 29(c), arguing that the government's evidence establishes only a buyer–seller relationship between him and Miller, rather than a conspiracy. The district court denied that motion and

sentenced Noble to life imprisonment, the statutory minimum given Noble's prior convictions and the jury's determination of drug quantity.

On appeal Noble presses his claim that the government established only a buyer–seller relationship with Miller and thus failed to prove him guilty of conspiracy. Noble catalogues factors that a number of our decisions deem useful in distinguishing commonplace drug deals from overt acts in a conspiratorial relationship: prolonged cooperation between seller and buyer, mutual support and dependence, standardized dealings, and sales on credit. Few of these factors are present in this case, says Noble. He describes his role as that of a "middleman" between Miller and Miller's customers.

A conspiracy is an agreement between two or more persons to commit an unlawful act. *United States v. Vaughn*, — F.3d —, 2013 WL 3336715, at *8 (7th Cir. July 3, 2013); *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). Evidence of a drug sale from one person to another, without more, is too little to imply a conspiracy. *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012); *United States v. Vallar*, 635 F.3d 271, 286–87 (7th Cir. 2011); *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (en banc). To establish a conspiracy the government must offer evidence of an agreement to distribute drugs distinct from the evidence of the underlying drug sales. *Brown*, 2013 WL 4048243, at *3 (7th Cir. Aug. 12, 2013); *Vaughn*, 2013 WL 3336715, at *8–9; *Vallar*, 635 F.3d at 287.

The government's evidence of conspiracy is thin, though Noble arguably has abandoned his sufficiency claim by describing himself as a "middleman" between Miller and Miller's customers. Miller bought drugs from Noble and delivered those wares to his own customers; if anything, *Miller* was the "middleman." So the label is baloney, but if Noble really thinks it defines his role, then this case is over: A middleman between Miller and Miller's customers would be a coconspirator of the participants on *both* sides of the transactions. *See United States v. Gilmer*, 534 F.3d 696, 701–02 (7th Cir. 2008); *United States v. Garcia*, 45 F.3d 196, 198 (7th Cir. 1995); *United States v. Simone*, 931 F.2d 1186, 1200–01 (7th Cir. 1991).

Almost as frivolous is the weight the government assigns to innocuous facts. At the extreme the government asserts that Noble surely was conspiring with Miller since he called Miller "cuz." What's more, says the government, Miller posted Noble's bail in Effingham and sent money for deposit into his prison commissary account. Miller was a drug dealer whose supply was choked off by Noble's arrest; that Miller lent the defendant money to get him "back out on the streets" shows only that Miller did not

want to find a new supplier (or, as the other testifying codefendant speculated, was motivated by a self-interest to remove Noble's incentive to help the government). And sending Noble a few hundred dollars to buy snacks or toothpaste no more proves a "conspiratorial" relationship than if a family member had sent the money.

The government also attempts to shoehorn the facts of this case into an alternative theory of conspiracy discussed in dicta in a few recent decisions. *See, e.g.*, *United States v. Moreland*, 703 F.3d 976, 985 (7th Cir. 2012) (discussing the "relational contract theory" of conspiracy); *Nunez*, 673 F.3d at 666 (same). Even if the government has correctly interpreted the language from those cases (and correctly applied that theory to the facts of this case), we have never upheld a conviction based on that potential theory and decline to do so here.

We have admitted that our earlier decisions distinguishing between a buyer–seller relationship and a conspiracy diverged and have been, at times, difficult to reconcile. But our recent decision in *Brown*, while acknowledging the incongruity of our precedents, has cleared a path for our decision in this and future cases. The government presented to the jury evidence that Noble had, about a dozen times, sold to Miller on credit large quantities of methamphetamine. We clarified in *Brown* that if the government proves these three characteristics of a drug sale—repeated transactions, credit sales, large quantities of drugs—a jury is entitled to infer the existence of a conspiracy. *See Brown*, 2013 WL 4048243, at *6, 8; *see also Johnson*, 592 F.3d at 756 n.5; *Vallar*, 635 F.3d at 277. So although that is the only evidence the government presented that links Noble to the Indiana conspiracy, it is enough to support his conviction.

AFFIRMED.