In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1301

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PEDRO MIGUEL PEREIRA,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 4:11-cr-40118-JES-JAG-1 — **James E. Shadid**, *Chief Judge.*

ARGUED FEBRUARY 13, 2015 — DECIDED APRIL 17, 2015

Before WOOD, *Chief Judge*, and BAUER and RIPPLE, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendant-appellant, Pedro Miguel Pereira ("Pereira"), was convicted by a jury, after a full trial, of conspiracy with intent to distribute at least 100 kilograms of marijuana in violation of 21 U.S.C. § 846. On appeal, he argues that there was insufficient evidence to support his conviction. Specifically, Pereira contends that the government proved only the existence of a buyer-seller relationship, which was insuffi-

cient to prove involvement in a drug-distribution conspiracy. We find that the record contains sufficient evidence from which a rational jury could infer that Pereira conspired to distribute marijuana and we affirm.

## I.  BACKGROUND

On December 8, 2011, an Illinois state trooper pulled over a vehicle driven by David Helsene ("Helsene"). Although it was December, Helsene was transporting two kayaks on top of his vehicle, which raised the trooper's suspicion. After a K-9 unit detected the presence of narcotics near the top of the vehicle, the trooper searched the kayaks and discovered approximately 145 pounds of marijuana hidden inside. Helsene was arrested and agreed to cooperate with law enforcement by participating in a controlled delivery of the marijuana to an individual in Philadelphia. Additionally, Helsene told authorities that he had received instructions from a man named Kenneth Clarke ("Clarke"), the source of the marijuana, to travel to New Jersey to collect $50,000 from Pereira. Helsene called Pereira and instructed him to "go where [he] went the last time." With law enforcement agents close behind, Helsene met with Pereira, who handed him a toolbox containing $41,000, and the agents arrested Pereira.

After a months-long investigation, Pereira, Clarke, Helsene and Pereira's brother, Jimmy, were charged with conspiring with each other and with persons known and unknown, to knowingly and intentionally distribute and possess with intent to distribute at least 100 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and 21 U.S.C. § 846.

At trial, Helsene testified that Pereira bought marijuana from Clarke, a supplier who worked out of California. Since becoming a courier for Clarke in April 2011, Helsene had delivered marijuana to Pereira on at least six occasions before they were both arrested in December 2011. On each of these occasions, Helsene transported large amounts of marijuana, which were stored in kayaks and secured to the top of his vehicle, from California to Pereira's residence in New Jersey. On a least four of these trips, the weight of those loads ranged from 60–100 pounds. Once Helsene arrived at Pereira's residence, he unloaded packages of marijuana from the kayaks, which Pereira then stored in his garage. Clarke was present during five of the deliveries, having met Helsene in New Jersey and accompanied him to Pereira's residence in order to "make sure everything was on the up and up." According to Helsene, Clarke and Pereira would often discuss price terms and the quality of the marijuana during those meetings. However, Pereira never provided payment for a new load to Helsene or Clarke at the time of delivery; rather, if any money was exchanged at all, it was for the prior delivery. Only once did Helsene stay in New Jersey for a few days, waiting for Pereira to drop off a payment for the most recent delivery.[1]

---

[1] Helsene described this payment arrangement as one of "consignment," leading the government to rely, in part, on a consignment theory of conspiracy. The legal term "consignment" refers to a sales arrangement in which the buyer is permitted to return unsold goods to the seller. The distinction between consignment sales and other payment arrangements, such as credit sales, can be a critical one, as this court has described consignment sales as "quintessential evidence of a conspiracy." *See United*

(continued...)

After Pereira received marijuana from Clarke, he distributed it for sale to various individuals, chief among them Nicholas Urciuoli ("Urciuoli"). Urciuoli testified that he aided Pereira throughout 2011 by selling marijuana acquired from Pereira to others and collecting money from the customers. Typically, Urciuoli received a pound of marijuana from Pereira every one to three weeks, depending on how quickly Urciuoli could sell it to his customers. Urciuoli was not required to pay for the drugs up-front; rather, Pereira would receive payment for the drugs after Urciuoli made his sales. Pereira never told Urciuoli how much to charge for the marijuana, but chided Urciuoli for not charging enough.

Urciuoli also performed a number of tasks for Pereira beyond selling drugs, including storing large quantities of marijuana at his residence on Pereira's behalf. In May 2011, Pereira paid Urciuoli approximately $10,000 to store 33 pounds of marijuana at his house. Within a few days, it was all gone: Urciuoli sold some of the marijuana to his own three or four customers, while the rest was picked up by Pereira's customers, only one of whom paid for the drugs up-front. When Pereira learned that Urciuoli's father was planning to move into the house in August 2011, he expressed concern over what

---

[1] (...continued)
*States v. Brown*, 726 F.3d 993, 999 (7th Cir. 2013). However, upon review of the record, there is no evidence beyond Helsene's mere use of the term "consignment"—such as testimony that Pereira was permitted to return unsold drugs that he had previously accepted for sale—to suggest that Pereira paid for the marijuana on consignment. Instead, the evidence supports the conclusion that Pereira purchased drugs on credit, and our analysis will proceed accordingly.

his "partners" would think about the situation and asked Urciuoli to find a new location for the drugs. Urciuoli, who understood that Pereira was referring to his suppliers in California when he referenced his "partners," reassured him that nothing would change and continued to store marijuana at his residence. Thereafter, Pereira paid him $250 per pound to store large quantities of marijuana at his residence, which Urciuoli again distributed to his and Pereira's customers. Since Pereira's customers did not typically pay up-front for the packages they received, Urciuoli maintained a handwritten ledger containing a record of the outstanding debts and money collected from those who owed Pereira for prior marijuana orders. Following Pereira's arrest, law enforcement personnel recovered the ledger and over $60,000 in drug proceeds from Urciuoli's bedroom. Urciuoli agreed to cooperate with law enforcement, and turned over $20,000 that he collected over the next few weeks from customers who owed Pereira for prior drug purchases.

In addition to compensating Urciuoli for storing marijuana, Pereira paid him $150 per package to ship large quantities of money—typically $40,000 per shipment—to Clarke and others in California via UPS. Urciuoli testified that Pereira asked him to accept packages of marijuana at his residence as well, but that he refused to do this. Text messages between Pereira and Urciuoli revealed that Pereira viewed this task as a "job" and that when Urciuoli wouldn't accept it, one of Pereira's customers, Nicola Pisani ("Pisani"), accepted the job in his place.

Pisani also testified at trial, characterizing his involvement with Pereira as a "business relationship." In describing his role in this relationship, Pisani said that he would typically

receive three to four pounds of marijuana per month from Pereira, except for when supply was low. Like Urciuoli, Pisani did not have to provide cash up-front for the drugs that he received from Pereira, nor was he required to sell the drugs at a certain price. Rather, he had two to three weeks to pay Pereira for these deliveries, usually owing him between $3,400 and $4,000 per pound of marijuana that he accepted.

Text messages between Pereira and Pisani revealed that the two men frequently communicated about the status of payments that Pisani was expecting from people to whom he had distributed marijuana. One such conversation revealed that Pisani had given another individual $4,000 worth of marijuana to distribute and was awaiting payment. When Pereira questioned whether the other individual could "handle it," Pisani reassured him by explaining, "I trust the kid, and you trust me." Other text messages revealed that Pereira and Pisani also spoke frequently about where and when to drop off payments for prior orders or pick up more marijuana, which sometimes involved going to Urciuoli's house. Pisani would give the money he owed to Pereira, Urciuoli, or once to Pereira's brother, Jimmy. Occasionally, Pisani exchanged the marijuana he received if he didn't like the quality of the product; he never returned any drugs without exchanging them for more and explained that Pereira discouraged returns of any kind, telling him at one point, "[t]here's [*sic*] no returns here."

The district court instructed the jury on the difference between a conspiracy and a buyer-seller relationship and told the jury that it could find Pereira guilty only if it found beyond

a reasonable doubt that he was a member of the conspiracy charged in the indictment.

After deliberating, the jury found Pereira guilty of conspiracy with intent to distribute at least 100 kilograms of marijuana. Pereira moved for a judgment of acquittal, arguing that the evidence was insufficient to support a verdict of guilty. The court denied the motion. This appeal followed.

## II. ANALYSIS

We will reverse a conviction on sufficiency-of-the-evidence grounds only when, after viewing the evidence in the light most favorable to the prosecution, we determine that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Love,* 706 F.3d 832, 837 (7th Cir. 2013).

"Conspiracy is the extra act of agreeing to commit a crime," *United States v. Brown,* 726 F.3d 993, 997 (7th Cir. 2013), but in cases involving drug sales, the analysis is complicated by the fact that the substantive trafficking crime is itself an agreement—one involving a buyer and seller who "agree on terms" and "exchange money or commodities at the settled rate." *Id.* at 998 (citing *United States v. Rock,* 370 F.3d 712, 714 (7th Cir. 2004)). This underlying agreement between the buyer and the seller is not the same as the agreement required to find conspiracy. "Rather, conspiracy to traffic drugs requires an agreement to further distribution." *Brown*, 726 F.3d at 998. Thus, to support a conviction for conspiracy here, the government must prove (1) that Pereira agreed with another person to further the distribution of drugs and (2) that Pereira knowingly and intentionally joined the agreement. *See id.* at 1005.

The government may prove the existence of a conspiracy through direct evidence, but often there will only be circumstantial evidence of the agreement to further distribution. Circumstantial evidence can raise an inference of conspiracy, but these factors can also be consistent with a mere buyer-seller relationship. So, "we have routinely held that a conviction for conspiracy to distribute drugs cannot be sustained *solely* on circumstantial evidence." *United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010). In *Johnson*, we identified a nonexhaustive list of characteristics that strongly distinguish a conspiracy from a buyer-seller relationship. These considerations include: "sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities." *Id.* at 755–56 (internal footnote omitted).

Based on the evidence in this case, a reasonable jury could infer that Pereira bought marijuana on credit from Clarke on at least six occasions from April 2011 until his arrest in December 2011. Helsene testified that Pereira did not pay up-front for the parcels of marijuana that Helsene delivered to his residence in New Jersey. Instead, Pereira would pay for the prior delivery or Helsene would wait in New Jersey for a few days until Pereira paid him for the current load. Moreover, the record indicates that the purpose of Helsene's final trip to New Jersey, which culminated in Pereira's arrest, was to collect $50,000 that Pereira owed Clarke. Finally, Urciuoli testified that Pereira instructed him to mail packages of large quantities of cash to

Clarke on several occasions. Taken together, this evidence is sufficient to establish that Pereira obtained marijuana on credit.

That Pereira merely bought marijuana on credit is not, on its own, sufficient to permit an inference of a conspiracy. *See Brown*, 726 F.3d at 999. But here, as we recounted earlier, the government's evidence of conspiracy encompassed far more than just a credit arrangement and is sufficient to permit a reasonable jury to discern an agreement to further trafficking of drugs. In the first place, the record establishes that Pereira's dealings with Clarke amounted to much more than just "a single sale, on credit, in a quantity consistent with personal consumption." *Id.* at 1000. Helsene's testimony revealed that on at least four of the six occasions that he delivered marijuana to Pereira, the kayaks contained between 60 and 100 pounds of marijuana, indicating that Pereira bought large quantities of drugs from his supplier. Furthermore, Pereira's transactions were not, as he argues, episodic. Helsene testified that he made six deliveries to Pereira, beginning in April 2011, before his arrest in December 2011, but did not make any trips from June through August because all of the crops had been harvested. Urciuoli and Pisani corroborated this portion of Helsene's testimony, as they both explained that there was a "slow season" for marijuana distribution that began in May and lasted until October or November. Excluding the summer months during which Helsene made no trips, the evidence sufficiently shows that Pereira received large quantities of marijuana from Clarke at a rate of once a month, for six months.

Quantity and frequency are circumstantial evidence of conspiracy to distribute drugs and when they are coupled with

the evidence of credit sales and other evidence of cooperation, as we have in this case, there is a "basis for the jury to distinguish the alleged conspiracy from the underlying buyer-seller relationship." *Johnson,* 592 F.3d at 755, 756 n.5. *See also Brown,* 726 F.3d at 1002 ("[A] relationship exhibiting all three *Johnson* factors … [is] widely accepted as sufficient proof of a trafficking conspiracy."). Given that all three factors—multiple, large quantity purchases, on credit—are present here, a jury could rationally conclude, beyond a reasonable doubt, that Pereira was guilty of conspiracy to distribute drugs.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Pereira's conviction.