In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-3503

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HERBERTO PULGAR,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:13-cr-30025 — **Sue E. Myerscough**, *Judge.*

ARGUED MAY 18, 2015 — DECIDED JUNE 19, 2015

Before KANNE and SYKES, *Circuit Judges*, and ELLIS,
*District Judge.**

KANNE, *Circuit Judge*. Markets, at bottom, exist for two
sets of people: buyers and sellers. In the context of the illegal
drug market, we attach sundry titles to members from either

---

* Of the Northern District of Illinois, sitting by designation.

set—dealer, distributor, trafficker, etc. But to attach the title of conspirator, there must be something else happening in the marketplace besides merely buying and selling some illegal drug. There must be an agreement between two or more parties to commit a crime distinct from the sale itself.

Here, the government alleged that Appellant Herberto Pulgar entered into such an agreement with Klinton Schmidt and Michael Myers—namely, to distribute 5 kilograms or more of cocaine.[1] *See* 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A). But there was one problem for the government: Pulgar never met Myers. Only Schmidt had. So at trial, the government focused on Pulgar's transactions with Schmidt to prove the conspiracy charge. Largely through Schmidt's testimony, the government offered evidence that: (1) Pulgar sold large quantities of cocaine to Schmidt at wholesale prices for over ten years; (2) Pulgar fronted cocaine to Schmidt; (3) Pulgar accepted returns from Schmidt when lousy cocaine did not sell; and (4) Pulgar enjoyed a friendship with Schmidt.

At the outset, we note that Pulgar vigorously disputed the government's evidence of fronting, as well as the government's evidence of a so-called "return policy." Pulgar is steadfast on appeal.

After a four-day trial, the jury returned a split verdict. It convicted Pulgar on the conspiracy count, although it found

---

[1] The government also alleged Pulgar distributed 500 grams or more of cocaine. *See* 21 U.S.C. §§ 841(a)(1)-(b)(1)(B). Pulgar contested both charges. Schmidt and Myers, on the other hand, pled guilty to their respective charges in related proceedings.

he conspired to distribute "*500 grams* or more of cocaine," not the "*5 kilograms* or more" originally charged in the indictment. The jury then acquitted Pulgar of the only other count—distribution of 500 grams or more of cocaine. Months later, the district court upheld the conspiracy conviction when it denied Pulgar's combined motion for judgment of acquittal and motion for a new trial.

Pulgar contends the evidence is insufficient to support the conspiracy conviction. In his view, the government merely proved a buyer-seller arrangement between him and Schmidt, which, under our well-established case law, is not enough to support a drug-distribution conspiracy. The government, of course, disagrees. It argues the evidence establishes a conspiracy to distribute cocaine, albeit circumstantially. As Pulgar raises no other issues on appeal, we examine this dispute in great detail. Before we do, some additional background is necessary.

## I.   BACKGROUND

*A. The Dealings of Pulgar and Schmidt*

Pulgar met Schmidt through a mutual friend in 2002. At the time, Pulgar lived near Chicago, Illinois, and Schmidt lived in Bloomington, Illinois. Not long after their initial meeting, Pulgar sold cocaine to Schmidt. Pulgar continued to sell cocaine to Schmidt at fairly regular intervals—once every month or so, with the exception of a few, brief hiatuses—until March 2013.

The quantities varied, but they trended upward over time. For example, the first transaction between Pulgar and Schmidt resulted in a sale of 4.5 ounces for approximately $2,600. By 2005, the amount increased to nearly half a kilo-

gram (over 16 ounces) for $12,000 to $16,000—depending on market demand. By 2010, the amount increased again, this time to three-quarters of a kilogram (over 26 ounces) for approximately $27,700.

Just as the quantity and price varied, so too did the place of purchase. Sometimes Schmidt purchased cocaine from Pulgar in Chicago, other times in Joliet. Sometimes the deals occurred at Wendy's, other times at Best Buy, and still other times "just off the interstate." It was not unusual, moreover, for the meeting place to suddenly change on the way to the deal. Schmidt never knew what type of vehicle Pulgar would arrive in—that changed as well.[2]

Wherever they met, one fact appeared to be consistent: Schmidt paid Pulgar in full for the cocaine at the time he received it. After Drug Enforcement Agency ("DEA") agents arrested Schmidt, he told them that Pulgar never fronted him drugs and that he always paid for the drugs at the time of the transaction. This statement is reflected in the reports of DEA Agents Weiss and Bonnett, who wrote that Schmidt "always pays for the cocaine when he gets it, and the cocaine is never fronted to Schmidt by Pulgar." In fact, no law-enforcement reports mention anything to the contrary. And Agent Bonnett testified to the cash-up-front arrangement be-

---

[2] Despite this evidence, the government argued at trial—and suggests on appeal—that the deals between Pulgar and Schmidt were standardized. Even if these transactions were standardized, which they were not, our analysis of the alleged conspiracy would not change. *See United States v. Brown*, 726 F.3d 993, 999 (7th Cir. 2013) (observing many standardized transactions are "equally consistent" with a mere buyer-seller arrangement).

fore the grand jury, stating Schmidt "was one of those guys that wanted to pay for everything up front, didn't want to owe anybody anything."

*B. Trial Evidence - The Government's Case-in-Chief*

*1. Evidence of Fronting[3]*

At Pulgar's trial, Schmidt changed his story and testified that Pulgar fronted him cocaine. The only example of fronting that Schmidt could remember, though, occurred during a sham deal that he arranged for the DEA. Schmidt, having been arrested one month before Pulgar, had been cooperating with the DEA during that deal.

Schmidt testified that Pulgar wanted to drop off cocaine while on his way to traffic court in Lincoln, Illinois, and then pick up the money for the cocaine after his hearing. Pulgar wisely did not want to bring the payment required for the cocaine—over $27,000 in cash—into court with him. So he set up this alternative arrangement with Schmidt to delay payment for a few hours. This is the only concrete example of fronting that the government introduced at trial. As it happens, Pulgar never received the money from that transaction; DEA agents arrested him after he dropped off the cocaine. The jury acquitted Pulgar of this conduct, which formed the basis of the distribution charge in Count 2.

Schmidt seemed to vaguely recall other evidence of fronting. He just could not remember when: "I mean there was probably a couple times that he fronted them to me. But like I said, I can't remember every single time." Notwithstanding

---

[3] We use the term "fronting" interchangeably with "credit transaction."

the vague nature of this testimony, the government assigns it great weight. The government claims it means Pulgar sold large amounts of cocaine to Schmidt, multiple times, *on credit*—a persuasive combination that has established a drug-distribution conspiracy in other cases. *See United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013) (observing "multiple, large-quantity purchases on credit" are considered "sufficient proof" of conspiracy), *cert. denied*, 134 S. Ct. 1876 (2014).

Additionally, the government argues that this evidence is supported by recorded phone calls between Pulgar and Schmidt, where Pulgar at least initially discussed fronting cocaine to Schmidt. The government emphasizes the fact that one of these discussions actually "resulted in a wholesale distribution on credit." Remarkably though, that discussion, which indeed resulted in an instance of fronting, also resulted in Pulgar's arrest. For as we mentioned above, it was precipitated by Schmidt's cooperation with the DEA. The government acknowledged as much during its closing argument, but maintained the example could still count against Pulgar: "You heard evidence of a credit transaction. … [T]he plan was to leave the money behind and pick it up on the way back. Didn't work out that way, but that was the plan."

Aside from what we just detailed, the government offered no other evidence of credit transactions between Pulgar and Schmidt. So the government turned its focus to other facts that it believed helped prove the conspiracy: returns of cocaine and a burgeoning friendship between Pulgar and Schmidt.

*2. Evidence of a Return Policy and a Friendship*

During direct examination of Schmidt, the government introduced evidence of an alleged return policy between him and Pulgar:

A. Okay. The cocaine, if it was real bad, I could give it back to him.

Q. Was this some sort of … return policy or something?

A. Yeah, I guess you could say that -- call it that.

Q. How many times would you say that happened during your relationship?

A. Maybe just a couple. Two or three.

The government relies heavily on this testimony. It also points out that Pulgar screened the cocaine for quality before he sold it to Schmidt. A return policy, the government argues, demonstrates that "no transaction between Schmidt and Pulgar was final until Schmidt resold the drugs." That in turn means that Pulgar held a "stake in the venture" of Schmidt's downstream sales, which in turn demands an inference of conspiracy to distribute cocaine. Or so the argument goes.

Not so, contends Pulgar. For he reads Schmidt's testimony differently. Pulgar first notes that evidence of a return policy—like evidence of fronting—did not surface until Schmidt testified at trial. And when it did surface, the government's introduction of the phrase "return policy" seemed to catch Schmidt by surprise: "Yeah, I guess you could say that -- call it that." Thus, Pulgar contends that the alleged "return policy" is little more than a rebranding effort by the

government to help support its conspiracy case. As he puts it, "2-3 returns of poor quality cocaine over 11 years surely do not constitute a return policy."

The stakes on this point are high. For when a "seller permits the buyer to return unsold drugs," he stands on the precipice of a consignment sale. *Brown*, 726 F.3d at 999. And consignment sales are "quintessential evidence" of a drug-distribution conspiracy. *Id.* (citing *Johnson*, 592 F.3d at 755 n.5)). But other factors are typically involved in consignment sales. A middleman is usually present, and profits are delayed "until the middleman distributes the drugs to others." *Johnson*, 592 F.3d at 755 n.5 (explaining that, in a consignment sale, "the supplier will not get paid until the middleman resells the drugs.") (citations omitted). We address this point in greater detail below.

The last piece of government evidence worth mentioning is that of a bourgeoning friendship between Pulgar and Schmidt. This friendship, the government argues, shows a trusting, close-knit relationship between Pulgar and Schmidt from which a rational jury could infer conspiracy. But the evidence is not overwhelming. It consists of two vacations, one baby shower, and one house renovation. Specifically, Schmidt testified that their families went on joint vacations to Mexico and Jamaica. Schmidt also testified that he attended Pulgar's baby shower, and that Pulgar helped renovate his house. "All of this suggests," the government argues, "the men were not a buyer and seller dealing solely at arm's-length."

*3. A Brief Summary*

Based on all of Schmidt's testimony, which to recap described multiple transactions of large-quantity cocaine, one example of fronting, two or three returns of lousy cocaine over an eleven-year period, and a burgeoning friendship between Pulgar and Schmidt, the government pieced together its conspiracy case against Pulgar. To be sure, the government introduced other evidence besides Schmidt's testimony. It introduced recordings. It introduced the testimony of Agent Bonnet, for example. But there is no doubt that Schmidt played the leading role in the government's case. We turn now to Pulgar's case-in-chief, which, unsurprisingly, also relied on Schmidt's testimony.

*C Trial Evidence - The Defendant's Case-in-Chief*

Schmidt played an equal—if not greater—role for the defense. Indeed, he played two: slimy criminal and independent businessman. The former is straightforward. During cross-examination, Pulgar impeached Schmidt by introducing his multiple felony convictions. Schmidt's record features four drug convictions, one firearm conviction, and one DUI conviction. Pulgar further impeached Schmidt with his prior inconsistent statements regarding fronting (recall he flip-flopped on that issue) and marijuana transactions. Regarding the marijuana transactions, Schmidt initially told agents that Pulgar was his only source for marijuana (when he was not in the mood for cocaine), but he later admitted that he had other sources for marijuana. Schmidt also admitted that he enjoys marijuana so much that his email address is a shortened version of "bud sack" spelled backward.

Schmidt's other role—independent businessman—is also straightforward. With considerable frequency, Schmidt offered testimony that he was his own man—a fact at odds with the alleged drug-distribution conspiracy. The following excerpt is a good example:

Q. If you made $4 million or nothing, that had nothing to do with [Pulgar], did it?

A. No.

Q. That's all on you? Your customers, your business; correct?

A. Yes.

Vexing the government, Schmidt did not stop there. He testified that he did not consult with Pulgar on any of his deals. He testified that once he purchased the cocaine, the task of selling it was his and his alone. He also testified that he never introduced any of his customers to Pulgar. Michael Myers, the other member of the alleged conspiracy, was Schmidt's sole "guy." And Myers was "totally separate and apart from anything Schmidt had going on with Pulgar." Schmidt also testified that Pulgar did not force him to share his profits after the sales. Pulgar contends this evidence, juxtaposed against the government's case, shows nothing more than a buyer-seller arrangement between him and Schmidt.

But there is more. Sometimes evidence not introduced can be just as powerful as evidence introduced. Accordingly, Pulgar highlights the following missing pieces in the government's case: (1) no evidence that Pulgar or Schmidt warned each other about threats to their business; (2) no evidence that Pulgar provisioned Schmidt with any cell phones, cutting agents, scales, bags for packaging, or any other tools

or supplies to further Schmidt's drug sales; (3) no evidence that, when Schmidt did return cocaine, Pulgar refunded his money or gave him a credit for other cocaine; and (4) no evidence that Pulgar and Schmidt were ever on the same side of a transaction. Needless to say, Pulgar contends the government's silence on these matters is significant.

With these facts in mind, we turn to the merits.

## II. ANALYSIS

We review challenges based on the sufficiency of the evidence in the light most favorable to the government. *United States v. Bey*, 725 F.3d 643, 649 (7th Cir. 2013). Typically, we will overturn a conviction only when "the record is devoid of evidence" from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Campbell*, 770 F.3d 556, 568 (7th Cir. 2014). But drug-distribution conspiracies hold a unique position in our legal sufficiency jurisprudence. In these special cases, we will also overturn a conviction when the plausibility of a mere buyer-seller arrangement is the same as the plausibility of a drug-distribution conspiracy. *See United States v. Johnson*, 592 F.3d 749, 755 (7th Cir. 2010) ("In this situation, the evidence is in equipoise … so the jury necessarily would have to entertain a reasonable doubt on the conspiracy charge.").

This standard is a function of the government's burden of proof. For it must prove "an agreement to distribute drugs that is *distinct from* evidence of the agreement to complete the underlying drug deals." *Johnson*, 592 F.3d at 755 (emphasis added). Evidence of an agreement to advance *further* distribution—beyond the initial transaction—is therefore required. *United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir.

1993) (*en banc*). Notably, this requirement has upset many convictions in this circuit. *See, e.g., Johnson*, 592 F.3d at 759 (vacating conspiracy conviction because the government proved only a buyer-seller arrangement); *United States v. Colon*, 549 F.3d 565, 569–72 (7th Cir. 2008) (same); *United States v. Contreras*, 249 F.3d 595, 601–02 (7th Cir. 2001) (same); *United States v. Rivera*, 273 F.3d 751, 757 (7th Cir. 2001) (same); *United States v. Baker*, 905 F.2d 1100, 1106–07 (7th Cir. 1990) (same).

A conspiracy requires a showing that (1) two or more people entered into an agreement to distribute drugs, and (2) the defendant knowingly and intentionally joined in the agreement. *Johnson*, 592 F.3d at 754. Sometimes agreements to distribute drugs are express; most times they are not. When they are not, the government may offer circumstantial evidence of these agreements. *Brown*, 726 F.3d at 998. Circumstantial evidence may include "multiple, large-quantity purchases, on credit." *Id.* at 1002. It may also include sales on consignment, payment of commission on sales, agreements to warn of threats to the flow of drugs, and provision of tools to advance the distribution. *Id.* at 999–1005.

Importantly, there is no rigid list or formula to prove a conspiracy in the absence of an express agreement. *Brown*, 726 F.3d at 1002 ("[O]ur list of example considerations may make it sound as if we are checking off boxes and only looking for specified indicia. *That is not the case*.") (emphasis added). We employ a totality-of-the-circumstances approach in these cases. In doing so, "[w]e take into account all the evidence surrounding the alleged conspiracy and make a holistic assessment of whether the jury reached a reasonable verdict." *Id.*

Here, Pulgar contends that the government adduced insufficient evidence to support the conspiracy conviction. In his view, the government established nothing more than a lengthy series of spot transactions between 2002 and 2013. These transactions support a buyer-seller arrangement, but not a conspiracy to distribute cocaine. At most, Pulgar contends, the evidence stands in equipoise and demands reversal. Viewing the record in the light most favorable to the government, we agree with Pulgar.

The government introduced insufficient evidence to prove a conspiracy. Specifically, the government did not prove Pulgar entered into an agreement with Schmidt to distribute cocaine. Pulgar, no doubt, sold large quantities of cocaine to Schmidt at wholesale prices for a period of eleven years. Pulgar admits as much on appeal. But "[r]epeat sales, without more, simply do not place the participants' actions into the realm of conspiracy." *Rivera*, 273 F.3d at 755; *see also United States v. Pereira*, 783 F.3d 700, 704–05 (7th Cir. 2015) ("Quantity and frequency are circumstantial evidence of conspiracy to distribute drugs *and when they are coupled with evidence of credit sales and other evidence of cooperation* … there is a basis for the jury to distinguish the alleged conspiracy from the underlying buyer-seller relationship.") (emphasis added) (citation and internal quotation marks omitted).

In *Pereira*, we affirmed a drug-distribution conspiracy conviction. *Id.* at 705. There, like here, the government established that the appellant purchased large quantities of drugs on multiple occasions. *Id.* at 701. Significantly, however, the government also established that the appellant "never provided payment" for the drugs "at the time of delivery[.]" *Id.* Instead, he would receive the drugs, distribute them to his

associates, and then not take payment until his associates sold out of their re-distributed supply. *Id.* at 702. In short, credit transactions were the norm in *Pereira*. Additionally, the government established that the appellant paid his associates to: (1) store the drugs, and (2) ship large quantities of money. *Id.* at 702–03. On at least one occasion, moreover, the appellant chided his chief associate "for not charging enough" to his downstream customers. *Id.* at 702.

The facts of *Pereira* are far removed from this case. First, Pulgar never expressed approval or disapproval for what Schmidt eventually charged for the cocaine. Once Pulgar sold the cocaine to Schmidt, Schmidt charged whatever he alone wanted to charge.

Second, the government did not establish that Pulgar and Schmidt engaged in credit transactions during their business relationship. Its only example of a credit transaction occurred during a deal that Schmidt helped arrange for the DEA, and, of course, Pulgar cannot be on the hook for that. *See United States v. Corson*, 579 F.3d 804, 811 (7th Cir. 2009) ("[A]n agreement must exist among *coconspirators*, that is, those who actually intend to carry out the agreed-upon criminal plan. A defendant is not liable for conspiring solely with an undercover government agent or a government informant.") (emphasis in original) (citations omitted).

Putting to one side the fact that by that point Schmidt was working for the government, the deal itself does not showcase a credit transaction indicative of conspiratorial behavior; it showcases an adapted arrangement designed for self-preservation. Pulgar did not want to bring $27,000 in cash with him to traffic court. So to avoid suspicion, he dropped off the cocaine with the intention of picking up the

money a few hours later on his way home from court. "This is not conspiratorial behavior; it is self-preservation." *Johnson*, 592 F.3d at 757.

And it was the exception—not the rule. For example, over the course of their eleven-year relationship, Schmidt testified that Pulgar "probably" fronted cocaine to him "a couple" other times, he just could not remember when. This evidence is vague and incomplete. Contrast it with *Pereira*, *supra*, and *United States v. Cabello*, 16 F.3d 179, 180–82 (7th Cir. 1994). In *Cabello*, a key government witness testified that the appellant was fronted cocaine "from 1988 through 1990 … *on a daily basis*[.]" *Id.* at 180 (emphasis added) (internal quotation marks omitted). We affirmed the conspiracy conviction there, finding specific evidence of repeated, fronted cocaine deals demonstrated that the appellant "had knowingly joined the conspiracy." *Id.* at 182 (collecting cases where fronting indicated conspiracy). In this case, the government's evidence of fronting does not supply a similar inference.

The government's evidence of an alleged return policy fares no better. Like the evidence of fronting, it is vague and incomplete. Schmidt testified that, over the course of his eleven-year relationship with Pulgar, he "[m]aybe" returned cocaine "[t]wo or three" times. He did not say when. He did not say how. And he did not say whether he received a refund or a credit from Pulgar for his troubles. In its brief, the government suggests this testimony demonstrates the

two engaged in consignment sales.[4] It does not. *See Johnson*, 592 F.3d at 756 n.5 ("A consignment sale that permits the middleman to return the unused drugs is quintessential evidence of a conspiracy because it shows that the supplier will not get paid until the middleman resells the drugs.").

There is no middleman in this case. There is Pulgar, and there is Schmidt. Myers is the only other named member of the charged conspiracy, but Pulgar never met him or dealt with him; he was Schmidt's "guy." More important, the government introduced no evidence that Pulgar gave Schmidt the option to pay him once he resold the returned drugs (on the two or three occasions that he actually returned them). To the contrary, overwhelming evidence shows that Pulgar received all his money at the initial point of sale. This is not the "quintessential evidence of a conspiracy" that we described in *Johnson*, 592 F.3d at 756 n.5, and in *Brown*, 726 F.3d at 999.

Deferential review does not require accepting a tortured interpretation of the evidence. Reviewing this record in the light most favorable to the government, we fail to see how this evidence even qualifies as proof of a standing return policy. To reiterate, these returns only "[m]aybe" happened "[t]wo or three" times over a span of eleven years. And Schmidt, the government's key witness, had his doubts: "I *guess* you could … call it [a return policy]" (emphasis added). We therefore reject the government's argument regard-

---

[4] The government concedes, however, that the majority of transactions between Pulgar and Schmidt were not consignment sales as the term is commonly understood.

ing this evidence. Two or three returns over an eleven-year period—without any additional details—does not a return policy make.[5]

Furthermore, the fact that Pulgar may have screened the cocaine for quality before he sold it to Schmidt does not change this result. Sellers often perform a quality assurance review before they sell their goods. Such a review is designed to prevent returns and to ensure repeat business. These goals apply with equal force to the illegal drug market, where sellers are similarly focused on maximizing profits. Here, quality screening does not make it any more or less likely that Pulgar engaged in a conspiracy to distribute cocaine.

That leaves the government with evidence of vacations, a baby shower, and a home renovation project—events shared jointly by Pulgar and Schmidt and family. While this evidence shows a level of intimacy indicative of something more than a buyer and seller dealing at arm's length, it must "be placed in context before an inference of participation in a conspiracy can be drawn." *Colon*, 549 F.3d at 568. Here, con-

---

[5] Because we reject the government's argument on this point, finding the alleged "return policy" to be a forced interpretation of the evidence, we save for another day the question of whether our precedent on returns conflicts with that of the Fifth Circuit. *Compare United States v. Delgado*, 672 F.3d 320, 333–34 (5th Cir. 2012) (*en banc*) (finding the existence of a return policy to be persuasive evidence of a drug-distribution conspiracy), *with United States v. Nunez*, 673 F.3d 661, 665 (7th Cir. 2012) (describing "returns for refunds" as "normal incidents of buyer-seller relationships, spot or otherwise").

text tells us that Pulgar and Schmidt enjoyed an eleven-year relationship, during which time they met, on average, once every other month (aside from a few, brief hiatuses). It is not surprising that a friendship blossomed over the course of the same period. Ruth Klein, *The Everything Guide To Being A Sales Rep: Winning Secrets To A Successful—and Profitable—Career!* 176 (2006) ("Successful sales professionals often find that they and their customers become good friends."). Without evidence of repeated fronting, sales on consignment, provisioning of tools or supplies,[6] warnings of threats to the business, or some other signal that the two enjoyed a heightened level of trust indicative of a drug-distribution conspiracy, we cannot infer anything nefarious from this friendship.

In sum, the record of trial does not support the conspiracy conviction. Employing the most charitable view of the evidence, it is just as plausible that a mere buyer-seller arrangement existed as it is that a conspiracy to distribute drugs existed. Consequently, any rational jury examining this case would harbor a reasonable doubt as to Count 1–the sole count on which Pulgar was convicted.

### III. CONCLUSION

Pulgar may have been a dealer, but he was no conspirator. Because the government failed to satisfy its burden of proof in this drug-distribution conspiracy case, we VACATE Pulgar's conviction and sentence.

---

[6] In *Brown*, for example, we affirmed a conviction where the appellant was provisioned with prepaid cell phones and a car featuring a secret compartment to hide drugs. 726 F.3d at 1006. Supplies of this sort are not present here.