In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1080

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID L. BRADFORD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 15-CR-30001 — **David R. Herndon**, *Judge.*

ARGUED OCTOBER 31, 2017 — DECIDED SEPTEMBER 19, 2018

Before WOOD, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. A jury convicted David Bradford of conspiracy to distribute controlled substances and related drug and firearms offenses. His appeal raises three claims of error. First, he contests the denial of his motion to suppress evidence recovered in a search of his home pursuant to a warrant. His chief complaint is that the warrant application

relied on statements from a confidential informant but omitted information damaging to the informant's credibility. Second, he challenges the denial of his pretrial motion to exclude evidence that he used the firearms seized in the search or directed others to use them. Last, Bradford claims that the government failed to prove a crack-cocaine conspiracy. We reject these arguments and affirm.

## I. Background

A grand jury returned a seven-count indictment against Bradford stemming from his drug-distribution operation in East St. Louis, Illinois. A jury convicted him on six of the seven charges: conspiracy to distribute and possess with intent to distribute controlled substances, *see* 21 U.S.C. §§ 841(a)(1), 846; transfer of a firearm to a felon, *see* 18 U.S.C. § 922(d)(1); two counts of distribution of cocaine base, *see* 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C); possession of marijuana with intent to distribute, *see id.* § 841(a)(1), (b)(1)(D); and possession of a firearm as a felon, *see* 18 U.S.C. § 922(g)(1). (The jury acquitted on the remaining charge of possession of a firearm in furtherance of a drug-trafficking crime. *See id.* § 924(c).) We limit our account of the facts to the background necessary to understand the issues raised on appeal.

Federal law enforcement opened an investigation of Bradford after he participated in a suspicious firearm purchase with his girlfriend Delenthegia Beard-Hawkins and their friend Danielle Smith. (The latter's first name might be misleading; Smith is a man.) In late February 2014, the trio went to an Illinois gun store where Bradford and Smith examined two .50-caliber Desert Eagle semiautomatic pistols. But it was Hawkins who ended up purchasing one. The

gun cost about $1,500, and because Hawkins did not have enough cash, Bradford pitched in a couple hundred dollars. Bradford also purchased a laser sight for another type of firearm. The clerk offered to ship the firearm to a gun store in Missouri where Hawkins lived so she could pick it up there.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") received information about the transaction and launched an investigation. Agents learned that both Bradford and Smith were convicted felons, so it was illegal for them to possess a firearm. *See* § 922(g)(1).

On March 4 ATF agents surveilled Hawkins as she picked up the Desert Eagle at a Missouri gun store and drove it to Bradford's home in East St. Louis, Illinois. When she arrived, Smith was on the front porch. Hawkins handed him the firearm, and when the two started walking toward the front door, agents arrested them. Bradford approached from around the corner, and he too was arrested.

Hawkins told the agents that she had three firearms in her home—two handguns and an AK-47 rifle—and that she would sometimes bring them to Bradford's house and leave them there. She also admitted to being a regular marijuana user, making it illegal for her to possess a firearm. *See* 18 U.S.C. § 922(g)(3). Though she denied purchasing the Desert Eagle for Bradford, she reported that he kept a 9mm pistol under his pillow and that she had seen two other firearms and ammunition at his house in the days leading up to her arrest.

All three were detained in the St. Clair County Jail on a 48-hour hold. Based on Hawkins's information, on March 6

ATF agents obtained a warrant to search her home and Bradford's. In Bradford's bedroom they recovered indicia of ownership of a Draco pistol (a box, an owner's manual, and a serial-number tag), as well as empty magazines, gun holsters, a gun lock, and miscellaneous firearm parts. They did not find any firearms or the laser sight Bradford purchased at the Illinois gun store. At Hawkins's home agents found a handgun, ammunition, and magazines, but they did not locate the second handgun or the AK-47 she said she kept there. The 48-hour hold expired that evening, and Bradford, Hawkins, and Smith were released. A few days later, Hawkins surrendered a Draco pistol to the ATF. As expected, the pistol matched the serial number on the tag recovered from Bradford's bedroom.

Around this time the ATF obtained additional information from confidential informants that Bradford was selling crack cocaine. Smith was one of those informants; he began cooperating with the ATF after his arrest. Agents used Smith to conduct two controlled crack-cocaine buys from Bradford, recording both transactions. Smith called Bradford's cell phone and asked to purchase crack. On April 18 the two met at Bradford's house, and Smith purchased 23.8 grams of crack for $1,400. Several days later Smith called Bradford and asked for more. On April 29 the two met again at Bradford's house, and Smith paid $2,250 for 33.8 grams of crack.

A few weeks after the controlled buys, Smith observed marijuana and various firearms in Bradford's home. Specifically, Smith reported to Special Agent Adam Ulery that on May 29 he observed an SKS rifle in Bradford's bedroom closet, a Smith & Wesson .40-caliber pistol and an XD

.40-caliber pistol on Bradford's bed, as well as a Tommy-gun rifle under Bradford's mattress. Smith also reported that Bradford sometimes kept firearms in his white Cadillac. Ulery had observed a white Cadillac parked in front of Bradford's residence; it was registered in Bradford's name.

Smith continued his cooperation, telling agents on June 8 that he observed Bradford carrying a Springfield XD .40-caliber pistol and saw marijuana packaged for sale at Bradford's house. He also reported that Bradford told him he had pistol-whipped a person named D-Bow in retaliation for stealing marijuana from him. Later that same day, Smith witnessed a firearms transfer at Bradford's residence; he reported that Bradford handed a bag containing several firearms to another person inside the home. Finally, Smith told the agents that earlier on June 8 he saw an SKS rifle and a Smith & Wesson .40-caliber pistol in Bradford's bedroom.

On June 9 Agent Ulery applied for another warrant to search Bradford's home. He swore to the facts we've just recited and noted his experience investigating the use of firearms in drug-trafficking crimes. He explained that a confidential informant had supplied information about Bradford's drug dealing and the firearms he kept in his home, and also that the informant had participated in two recorded crack buys from Bradford. He described these facts in some detail, and he also stated that the informant "ha[d] proven reliable in this and in other criminal investigations over the last three months." Though he mentioned Smith's role in the illegal firearm purchase that prompted the March 6 warrant, he did not identify Smith as the informant.

A magistrate judge issued the warrant that same day. The search of Bradford's home yielded three rifles, a digital scale,

and two sandwich baggies each containing about one ounce of marijuana.

As we've noted, Bradford was indicted on charges of conspiracy to distribute controlled substances and six related drug-distribution and firearms crimes. He moved in limine to suppress the evidence recovered in the March 6 and June 9 searches of his home. The motion was denied in all respects; only the second search remains at issue. As relevant here Bradford argued that the June 9 warrant was invalid because the agent's application omitted negative information relevant to Smith's credibility.

At the suppression hearing, Agent Ulery testified that by the time of the June 9 warrant application, Smith had served as an informant in two other investigations involving controlled buys and those transactions had confirmed his reliability. He told the court that Smith had advised the ATF that he had two prior felony convictions—one for possession of a controlled substance and the other for armed robbery—but he actually had three: possession of a controlled substance, residential burglary, and possession of a firearm by a felon. Finally, Ulery testified that Smith was on probation when he began cooperating and that the ATF had paid him for his services. None of this information—Smith's record, his probation status, and the fact that he was a paid informant—was included in Ulery's warrant application.

Ruling on the motion, the district judge acknowledged that Ulery had omitted important information about Smith's credibility from the warrant application. But the judge reasoned that Smith's statements were otherwise detailed, timely, and adequately corroborated, and that the applica-

tion contained sufficient additional information to support probable cause for the search.

Bradford also moved in limine to exclude any evidence that he had used the seized firearms in other crimes or directed others to use them. The motion was cursory and entirely generic. It did not specify the evidence at which it was directed or explain why the evidence was inadmissible other than a bare assertion that it was irrelevant and prejudicial. In a written response, the government explained that it would seek to introduce evidence of four violent acts (or threats of violence) as direct evidence of the charged offenses.

First, the government sought to introduce evidence that Bradford ordered a shooting in retaliation for a threat against one of his subordinates in the drug-distribution conspiracy. Raphael Harris, Bradford's cousin, sold marijuana for him at a housing complex in the area. The boyfriend of a woman who lived in that complex had threatened Harris, so Bradford loaned him a Mossberg rifle to "shoot up" the woman's apartment. Harris did as Bradford directed and shot up the apartment. No one was injured.

The second set of events involved Bradford's repeated threats and violence against a teenager nicknamed D-Bow, who had stolen marijuana from him. In retaliation for the theft, Bradford and Harris went to D-Bow's house and violently banged on the security bars on his bedroom window. Next, Bradford spotted D-Bow on a bike and chased him down with his truck. When D-Bow jumped off the bike and fled on foot, Bradford ran over the bike. Bradford later confronted D-Bow directly and pistol-whipped him.

The third incident centered on Bradford's plan to rob one of his crack suppliers because the two had a falling-out. Bradford solicited Smith and his brother to steal her car where she kept both drugs and cash. They didn't go through with it.

In the fourth and final episode, an associate of Bradford's nicknamed Boo Man arranged for Bradford to purchase firearms at someone's house. When Bradford, Boo Man, and two others entered the house, they were held up at gunpoint and robbed. Bradford later instructed Boo Man to shoot up the house and loaned him a firearm for that purpose. Boo Man didn't follow through.

In a written order, the judge summarily ruled that "the anticipated evidence outlined by the government" was "relevant evidence directly related to the charges" because, as the government asserted, "it demonstrates how Bradford allegedly conducted his [drug] 'business.'" The judge also ruled, again summarily, that the evidence was not "unduly prejudicial." But the judge's concluding line was cryptic: "[T]o the extent that Bradford's motion goes to relevant evidence directly related to the charges … , it is DENIED. However, to the extent that the evidence goes to conduct that is not relevant to the charges … , it is GRANTED."

The charges were tried to a jury over five days. The government's case included, among other evidence, testimony from Hawkins, Smith, Raphael Harris, and Jeremy Harris (Raphael's brother, who also sold drugs for Bradford). The government also presented evidence of the four violent incidents we've just discussed without objection from Bradford. The jury found him guilty on six counts: conspiracy, two of the three firearms crimes, and all three drug-

distribution counts (two involving cocaine base and one involving marijuana). The judge sentenced him to 35 years in prison and this appeal followed.

## II. Discussion

### A. The Search Warrant

Bradford challenges the denial of his motion to suppress the fruits of the June 9 search. He maintains that the omission of information damaging to Smith's credibility was fatal to the warrant application because it deprived the magistrate judge of information vital to the determination of probable cause.

"Probable cause is a practical, nontechnical inquiry that asks whether there is a fair probability, given the totality of the circumstances, that evidence of a crime will be found in a particular place." *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). We give "great deference" to the probable-cause determination of the magistrate who issued the warrant. *United States v. Glover*, 755 F.3d 811, 816 (7th Cir. 2014) (citing *Gates*, 462 U.S. at 236); *see also United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008).

When a warrant application is based on information from an informant, our cases have identified five factors that are particularly relevant to the warrant's facial validity: "the level of detail, the extent of firsthand observation, the degree of corroboration, the time between the events reported and the warrant application, and whether the informant appeared or testified before the magistrate." *Glover*, 755 F.3d at 816. Although the sufficiency of a warrant application is a highly fact-specific determination, we have said that "infor-

mation about the informant's credibility or potential bias is crucial." *Id.* Omitting this information deprives the magistrate of important data in the probable-cause calculus. The omission is not necessarily fatal, however. "[E]ven where some credibility information is omitted, a strong showing on the primary factors can salvage the warrant." *Id.* at 818; *see also United States v. Musgraves*, 831 F.3d 454, 460 (7th Cir. 2016).

Agent Ulery's warrant application left out adverse information bearing on Smith's credibility: his three felony convictions, one of which he failed to disclose to law enforcement; his probation status; and the payments he received for his services as an informant. And Smith did not appear before the magistrate for questioning. Still, we're satisfied that the June 9 warrant was facially valid. Smith's information was fresh, firsthand, quite detailed, and corroborated, all of which supports the magistrate's finding of probable cause.

A few examples suffice to show that Smith's information was both sufficiently detailed and adequately corroborated. His descriptions of the firearms Bradford kept in his home were quite specific as to gun type, and he also identified their precise location within the home. Hawkins provided corroboration; the information agents had gathered from her confirmed that Bradford kept multiple firearms in his home. And the Draco pistol she turned over to the ATF matched the serial-number tag recovered in the earlier search of Bradford's home. Smith also reported that Bradford sometimes kept his firearms in his white Cadillac, and the ATF confirmed that Bradford owned one. Finally, the warrant application chronicled the controlled buys, which confirmed

Smith's reports that Bradford was dealing crack and mariju-
ana from his home.

Bradford insists that the information from sources other
than Smith was too stale to support a finding of probable
cause. The most recent controlled buy took place around six
weeks before the warrant was issued, and Hawkins had
described the firearms in Bradford's home three months
earlier. It's true that "'[s]taleness' is highly relevant to the
legality of a search for a perishable or consumable object"
like crack cocaine or marijuana. *United States v. Seiver*,
692 F.3d 774, 777 (7th Cir. 2012). But "depending on the
circumstances, evidence of the sighting of a gun (or related
items) does not automatically grow stale as time passes."
*United States v. Hicks*, 650 F.3d 1058, 1068 (7th Cir. 2011)
(collecting cases). And more recent information supporting
probable cause can freshen information that might otherwise
be stale. *See United States v. Prideaux-Wentz*, 543 F.3d 954, 958
(7th Cir. 2008); *United States v. Newsom*, 402 F.3d 780, 783 (7th
Cir. 2005).

Smith's last report to the agents did just that. On June 8,
the day before the warrant issued, he observed firearms and
drugs packaged for distribution in Bradford's residence. This
information, like his earlier reports, was firsthand and
specific. In particular, he identified the firearms Bradford
possessed by type and location in the residence.

Smith hangs his hat on *United States v. Glover*, but that
case is distinguishable. There, as here, the affidavit in sup-
port of the warrant omitted facts damaging to the inform-
ant's credibility. *Glover*, 755 F.3d at 815. But that is where the
similarity ends. In *Glover* the information from the informant
was only minimally corroborated and provided little detail.

*Id.* at 817. Given the weak showing on the primary factors relevant to probable cause, the omission of adverse credibility information was fatal to the warrant application. *Id.* at 818. In contrast, Smith's information was quite detailed and more robustly corroborated. And his information stood alongside ample additional evidence from the ATF's investigation. Considering the warrant application as a whole, the omission of facts bearing negatively on Smith's credibility was not fatal to the magistrate's probable-cause finding.

### B. Other-Acts Evidence Under Rules 404(b) and 403

Bradford also challenges the admission of evidence of the four violent incidents we've described above. He argues that this evidence should have been excluded as impermissible character evidence under Rule 404(b) of the Federal Rules of Evidence or alternatively under Rule 403 because the risk of unfair prejudice substantially outweighed its probative value.

The parties first debate whether we should consider this issue at all, as well as the appropriate standard of review. The government argues that the judge's ruling on Bradford's motion in limine simply postponed the decision on admissibility until trial, so Bradford either forfeited or strategically waived the issue by not reasserting his objection at trial. Accordingly, the government asks us to review for plain error or decline to review the issue altogether. *See United States v. Ridley*, 826 F.3d 437, 442, 443 n.1 (7th Cir. 2016). Bradford urges us to review for abuse of discretion, insisting that he preserved his objection by raising it in a motion in limine.

The Rules of Evidence provide that "[o]nce the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." FED. R. EVID. 103(b). A "definitive ruling" is one that "definitively settle[s] the issue of admissibility." *United States v. Gajo*, 290 F.3d 922, 927 (7th Cir. 2002). But Rule 103 also states that objections to the admission of evidence must be made *with specificity*. *See* FED. R. EVID. 103(a)(1)(B); *see also United States v. Gulley*, 722 F.3d 901, 906 (7th Cir. 2013) (explaining that a generalized motion in limine is insufficient to preserve a Rule 404(b) objection for review).

Bradford's motion in limine did not satisfy Rule 103(a)'s specificity requirement. It did not identify the specific evidence he feared would be admitted or explain why it was inadmissible. On appeal he relies on Rules 404(b) and 403, but his motion in limine mentioned neither rule. The government's response listed the four incidents we've described above and characterized these episodes as direct evidence of the charged crimes insofar as they showed how Bradford ran his drug business.

Based on these submissions, it's no wonder the judge's ruling was equivocal. The order appears to simultaneously accept the government's argument and punt the whole issue over to trial. It concludes: "[T]o the extent that Bradford's motion goes to relevant evidence directly related to the charges … , it is DENIED. However, to the extent that the evidence goes to conduct that is not relevant to the charges … , it is GRANTED." That's not a definitive ruling. So Bradford had to lodge a timely and specific objection at trial

to preserve the issue for appeal. He did not do so. His arguments under Rules 404(b) and 403 are entirely new.

That means our review is constrained by the plain-error standard, which is a difficult hurdle for a challenger to clear. Reversal is unwarranted unless Bradford can establish a "clear or obvious" error that affected his substantial rights. *United States v. Swan*, 486 F.3d 260, 264 (7th Cir. 2007). Even then, we will not "exercise our discretion to correct the error unless it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (internal quotation marks omitted). Bradford has not carried this burden.

Rule 404(b) bars the admission of "[e]vidence of a crime, wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). The government contends that the testimony regarding the four violent episodes was direct evidence of the charged drug conspiracy and firearms crimes, taking it outside the ambit of Rule 404(b). *See United States v. Gorman*, 613 F.3d 711, 717 (7th Cir. 2010).

Evidence that "tend[s] to prove the elements of the offense" does not violate Rule 404(b). *United States v. Vargas*, 689 F.3d 867, 874 (7th Cir. 2012); *Gorman*, 613 F.3d at 717. More to the point here, "evidence directly pertaining to the defendant's role in a charged conspiracy" falls outside the scope of Rule 404(b). *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010). To win a conviction on the conspiracy count, the government had to prove that Bradford "knowingly and intentionally" joined an agreement to distribute drugs. *United States v. Pulgar*, 789 F.3d 807, 813 (7th Cir. 2015). To convict him of possessing a firearm in furtherance of that

conspiracy, the government had to prove that the firearms listed in the indictment did indeed "further, advance, move forward, promote or facilitate the drug-trafficking crime … by providing the dealer, his stash, or his territory with protection." *United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012) (citing 18 U.S.C. § 924(c)).

As we've explained, the government introduced testimony that Bradford loaned a Mossberg rifle to Raphael Harris, one of his distributors, with instructions that he shoot up the apartment of a woman whose boyfriend had threatened him. The Mossberg is listed in the indictment among the firearms that Bradford possessed in furtherance of the drug-distribution conspiracy. It's also listed in the felon-in-possession count. So the testimony about Bradford's transfer of this particular firearm was properly before the jury on these counts. It was also properly before the jury as direct evidence of the charged conspiracy—though *not* because it demonstrates how Bradford conducted his drug business, as the government (primarily) argues. The notion that other-crimes evidence is always admissible to prove how the defendant ran his criminal enterprise is unsound.

A narrower justification for introducing this evidence is that a drug-distribution conspiracy requires more than a mere buyer-seller relationship; it requires evidence of a shared stake in the illegal venture—for example, the "provision of tools to advance the distribution." *Pulgar*, 789 F.3d at 813. Evidence that Bradford gave Harris the Mossberg rifle to use in a show of force to preserve authority in his assigned drug territory is just this sort of direct evidence of a conspiracy.

A similar rationale might also cover Bradford's retaliation against D-Bow for stealing marijuana from him. Here again, evidence that Bradford and Harris used intimidation and violence to protect their drug-trafficking enterprise from perceived threats tends to prove that they participated in a conspiracy. *See United States v. Love*, 706 F.3d 832, 838 (7th Cir. 2013) (finding sufficient evidence of a drug-distribution conspiracy in part because the defendant and his coconspirators beat up an individual who the defendant suspected of robbing his crack house); *United States v. James*, 540 F.3d 702, 707 (7th Cir. 2008) (citing the fact that the defendant "protected the [drug ring's] territory through violence" as evidence of the defendant's participation in a drug-distribution conspiracy).

The third episode is a closer call. Bradford had a falling-out with one of his suppliers and solicited Smith to steal her car, knowing that she stored drugs and cash in it. Perhaps it could be inferred that Bradford would distribute the stolen drugs or that he plotted against his supplier to intimidate a would-be rival in order to protect his own drug trade. *See, e.g., United States v. Stephenson*, 53 F.3d 836, 844–45 (7th Cir. 1995) (involving evidence of the defendants' attempt to steal drugs with plans to distribute the stolen product); *United States v. Nieto*, 721 F.3d 357, 367–68 (5th Cir. 2013) (involving evidence that the defendant robbed rival drug dealers to maintain a monopoly over the drug trade). The government's brief touches on these purposes to justify its introduction of this evidence, but the argument is not developed.

In the fourth and final incident, Bradford gave a firearm to a coconspirator nicknamed Boo Man and told him to shoot up a house where the two had been robbed as they

were purchasing firearms. This episode is comparable to the retaliation against D-Bow, though only loosely so.

Our point in tracing these plausible alternative justifications relates to the plain-error standard of review. It's far from "clear or obvious" that admitting this evidence violated Rule 404(b). And even if it was error, Bradford has not demonstrated that admitting this evidence violated his substantial rights and seriously undermined the fairness and integrity of his trial.

As a fallback, Bradford argues that the evidence should have been kept out under Rule 403's balancing test, which permits exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of … unfair prejudice." This argument requires only brief comment. Bradford insists that the probative value of this evidence was diminished because he did not "actively dispute" that he possessed firearms. The premise of this argument is correct: an important consideration in Rule 403 balancing is the extent to which the defendant actually contests the fact that the evidence tends to prove. *United States v. Gomez*, 763 F.3d 845, 857 (7th Cir. 2014). "[I]f a defendant offers to concede or stipulate to the fact for which the evidence is offered, additional evidence may have little probative value." *Id.* But Bradford never offered to stipulate that he possessed the firearms listed in the indictment. As a more general matter, because Rule 403 is a balancing test, it's hard to show plain error. We see no such error here.

## C. Sufficiency of the Evidence of a Crack Conspiracy

Finally, Bradford insists that the evidence was insufficient to prove a conspiracy to distribute crack cocaine. This argu-

ment requires little comment. It should be clear from our description of the trial evidence that the government proved Bradford's participation in an ongoing crack-distribution conspiracy, not just two isolated crack-cocaine transactions. And even if Bradford is right that the evidence was insufficient to prove an agreement to distribute crack, the conspiracy conviction would still stand. Bradford was charged with conspiracy to distribute *both* crack cocaine *and* marijuana. He does not argue that the evidence was insufficient to prove his participation in a marijuana-distribution conspiracy.

AFFIRMED.